UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN RIVERS, et al.,

Plaintiffs,

v.

UNITED STATES ARMY CORPS OF
ENGINEERS, et al.,

Defendants.

Case No. 1:03-cv-00241-GK

**PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE WHY
DEFENDANT THE U.S. ARMY CORPS OF ENGINEERS
SHOULD NOT BE HELD IN CONTEMPT AND SANCTIONED
AND SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiffs in the above-captioned action hereby move this Court to issue an order

requiring the U.S. Army Corps of Engineers (the "Corps") to show cause why it should not be

held in contempt of this Court's order dated July 12, 2003, and sanctioned for its conduct.

## BACKGROUND AND RELEVANT FACTS

On July 12, 2003, this Court issued a preliminary injunction requiring the U.S. Army

Corps of Engineers ("Corps") to undertake specific actions to modify its management of the

Missouri River to avoid irreparable harm to three species protected by the Endangered Species

Act ("ESA"):  the endangered least tern and pallid sturgeon, and the threatened piping plover.

Brazenly, flouting this Court's authority, the Corps has not only violated the requirements of the

Court's injunction, but has stated its intention to continue to do so – thus confirming its historical

willingness to engage in any possible measures to avoid implementing management reforms

critical to preservation of these three species.  Plaintiffs respectfully request that the Court issue

an order requiring the Corps to show cause why its should not be held in contempt, and to

sanction the Corps for its outrageous conduct.

A.    **The Court's Grant Of Preliminary Injunction Requiring The Corps To Implement A Summer Low Flow Period**

On May 23, 2003, Plaintiffs in this matter filed an Application For Preliminary Injunction

(the "Application"), seeking to enjoin implementation by the Corps of its Annual Operating Plan

("2003 AOP") for the Missouri River.  Implementation of the 2003 AOP by the Corps would

perpetuate over a decade's worth of delay and misdirection by the Corps in avoiding the

implementation of flow reforms on the River that are critical to the preservation and recovery of

three species protected under the Endangered Species Act ("ESA").  The injunction sought by

Plaintiffs sought to enforce the flow modification provisions of the comprehensive Biological

Opinion issued by the U.S. Fish and Wildlife Service ("Service") in 2000 (the "2000 BiOp"),

which affirmed the Service's position for the preceding ten years that flow reforms were

necessary to avoid harm to and eventual extinction of the three species.  The flow modifications

have been confirmed as necessary by the National Academy of Sciences, all of the state fish and

wildlife management agencies from the Missouri River basin, and a separate independent panel

of expert scientists.

Specifically, the 2000 BiOp required the Corps, *beginning in Summer 2003*, to reduce

flows from Gavins Point Dam to 21 thousand cubic feet per second (Kcfs) by July 15, to hold

them at that level until August 15, and then to increase flows to no more than 25 Kcfs until

September 1.  See 2000 BiOp, Exhibit 1 to Declaration of Janice Schneider in support of

Plaintiffs' Application for Preliminary Injunction, at 242-43.  The Corps' 2003 AOP sought to

avoid these flow requirements.  In contrast to the scientifically well-supported flows required by

the 2000 BiOp, the 2003 AOP "flow-to-target" regime provides for  summer flows  that begin at

the significantly higher level of 26 to 27 Kcfs, and which would *increase* as needed to meet navigation targets downstream.  In a radical departure from its decade long position, the Service blessed the 2003 AOP in an unsupported and fundamentally flawed 2003 BiOp.  Plaintiffs' Application sought to overturn the 2003 BiOp as arbitrary and compel the Corps to comply with the flow modification requirements of the 2000 BiOp.

On July 12, 2003, this Court granted the preliminary injunction requested by Plaintiffs. The Court enjoined the Corps from (1) implementing the summer water flow provisions of the 2003 AOP; (2) taking any action that would implement or be consistent with the provisions relating to summer water flow contained in the Service's 2003 Biological Opinion[1]; and (3) taking any action inconsistent with the provisions relating to summer water flow contained in the 2000 BiOp.  See Order of United States District Judge Gladys Kessler entered July 12, 2003, Docket No. 89, at 2, attached hereto as Exhibit A.  This order was accompanied by an exhaustive 66-page opinion (Docket No. 88), attached hereto as Exhibit B, in which this Court found:

> Plaintiffs have established a likelihood of success on the merits of
> their ESA and APA claims against the Federal Defendants, and the
> least tern, piping plover, and pallid sturgeon will face irreparable
> harm if the Corps is not enjoined from implementing the revised
> 2003 AOP without a summer low flow component.  Moreover, the
> balancing of harms and the public interest considerations weigh in
> favor of issuing an injunction against the Corps.

Order, Exhibit B at 66.

## B.   The Corps' Unapologetic Violation Of This Court's Injunction

Under the plain terms of the Court's injunction, the Corps must reduce flows from Gavins Point Dam to 21 Kcfs by July 15, 2003.  See Order, Exhibit A in support of Plaintiffs' Application for Preliminary Injunction, at 2; 2000 BiOp, Exhibit 1 to Schneider Dec., at 242-43.

---

[1] This Court held Plaintiffs were likely to succeed in striking down the 2003 BiOp as arbitrary and capricious.

DC\608836.1

The Corps has not done so.  As of the filing of this Motion, according to data published by the Corps on its website, since July 15, 2003, the Corps has maintained flows from Gavins Point Dam (as measured by flow rates at Yankton, Nebraska, the first measuring point below the Dam) at 25 Kcfs or higher.  See Printout from "DCP Data" portion of Corps website on July 17, 2003, Exhibit 1 to Second Declaration of David A. Becker ("Second Becker Decl.").[2]  Moreover, the Corps current Power Production Order for releases from Gavins Point Dam indicate that flows of at least 25 Kcfs will continue through the end of the day of this filing.  See Printout from "Project Power Production Orders" portion of Corps website on July 17, 2003, Exhibit 2 to Second Becker Decl.[3]

The Corps does not contest that they are in violation of this Court's Order, and to the contrary, has affirmatively stated that although it fully understands the plain terms of the injunction, it will *continue* to operate in violation of the injunction.

That the Corps fully understands its obligations under this Court's injunction is clear.  In a July 15, 2003 press release, the Corps notes that "[a]n injunction issued by the U.S. District Court for the District of Columbia on July 12, 2003 prohibits the Corps from implementing the summer flows set forth in the 2003 Annual Operating Plan and 2003 Supplemental Biological Opinion."  July 15, 2003 Press Release, attached as Exhibit 3 to Second Becker Decl., at 2-3. And in its emergency motion for a stay of the injunction pending appeal, filed July 15, 2003 in

---

[2] Flow data is published by the Corps on its website at http://www.nwd-mr.usace.army.mil/rcc/programs/dcpext.html on an hourly basis.  Flow measurements from the Yankton location, which is below Gavins Point Dam, may be viewed by entering the identifier "YKN" in the dialog box requesting a "DCP ID" at that address.  The term "Q" denotes flows from Gavins Point Dam in kcfs and the page is updated every 1 to 4 hours.

[3] The current power production orders for Gavins Point Dam releases appear on the Corps website at http://www.nwd-mr.usace.army.mil/rcc/projdata/showorders.cgi?GAPT.  The power production order shown as Exhibit 2 to the Second Becker Dec. indicates the flows of 25,000 cfs ordered through July 18, 2003, as directed by Lawrence J. Cieslik, the Corps' Chief of Missouri River Basin Water Management.

the United States Court of Appeals for the District of Columbia Circuit, the Corps similarly notes that "to comply with the district court's order, the Corps would need to reduce releases to 21,000 cfs by July 15th, and hold at that level until August 15th." Emergency Motion filed in U.S. Court of Appeals for the D.C. Circuit, at 15, attached as Exhibit 4 to Second Becker Decl., at 16.

Yet despite its clear understanding of the Court's Order, and the requirement that it reduce flows as required by the 2000 BiOp, the Corps bluntly states in its July 15 Press Release that it "plans to continue operating under the 2003 Supplemental Biological Opinion," Exhibit 3 to Second Becker Decl. at 2-3. Additionally, and in its emergency motion for stay to the D.C. Circuit, the Corps states that it has "chosen to remain in compliance with Nebraska district court's order," (instead of this Court's order) which according to the Corps, requires it to continue the current high flows. Exhibit 4 to Second Becker Decl. at 3.

## ARGUMENT

### A.    The Corps Has Violated This Court's Order Granting The Preliminary Injunction And Should Be Held In Contempt

18 U.S.C. § 401 provides this court with the authority to find a party in contempt for failing to comply with an injunction. It reads, in relevant part: "A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as… (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command." Furthermore, the power to punish disobedience or resistance to a lawful order is inherent in an Article III Court. Armstrong v. Exec. Office of the Pres., 1 F.3d 1274, 1289 (D.C. Cir. 1993) (quoting Shillitani v. United States, 384 U.S. 364, 370 (1966), "There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt").

The Corps' refusal to comply with this court's order provides overwhelming grounds for a finding of contempt.  To grant this motion, this court must find that: (1) this court's order is clear and unambiguous; (2) proof of the Corps' noncompliance is clear and convincing; and (3) the Corps has taken no steps to substantially comply with the order.  Armstrong, 1 F.3d at 1289; Washington-Baltimore Newspaper v. Washington Post, 626 F.2d 1029, 1031 (D.C. Cir. 1980); Morgan v. Barry, 596 F. Supp. 897, 898-99 (D.D.C. 1984); Food Lion Inc. v. U.F.C.W. Int'l. Union, 103 F.3d 1007, 1017 (D.C. Cir. 1997) (citing Glover v. Johnson, 934 F.2d 703, 708 (6th Cir. 1991)).

The Corps' own admissions establish that this Court's order is clear and unambiguous, and that it fully understands what the injunction requires.  This is plain from the Corps' July 15 press release ("[a]n injunction issued by the U.S. District Court for the District of Columbia on July 12, 2003 prohibits the Corps from implementing the summer flows set forth in the 2003 Annual Operating Plan and 2003 Supplemental Biological Opinion") and in its emergency motion to the Court of Appeals ("[T]o comply with the district court's order, the Corps would need to reduce releases to 21,000 cfs by July 15th, and hold at that level until August 15[th"]).  Exhibit 3 to Second Becker Decl. at 2-3, Exhibit 4 to Second Becker Decl. at 15.

The evidence that the Corps has violated this Court's Order is not just "clear and convincing," it is incontrovertible.  The Corps own publications demonstrate that the Corps has and continues to operate the River to permit releases from Gavins Point Dam that significantly exceed the low-flow releases required by this Court's injunction.  See Exhibits 1 and 2 to Second Becker Decl.  Moreover, the Corps acknowledges that it has done so and that it will continue to do so.  See Exhibit 3 to Second Becker Decl. at 2-3; Exhibit 4 to Second Becker Decl. at 3.

6

Because American Rivers has adduced clear and convincing evidence that a clear and unambiguous order has been violated, the Corps must prove, to avoid a contempt finding, that it substantially complied in good faith by taking all reasonable steps within its power. Food Lion 103 F.3d at 1017; Morgan, 596 F. Supp. at 899. But no such steps have been taken. Indeed, the Corps' conduct, as described above, vitiates any suggestion that the Corps has somehow acted in good faith to comply with the Court's order.

### B.   The Existence Of The Injunction Issued By The Nebraska District Court Does Not Excuse The Corps' Violation Of This Court's Order

The Federal Defendants have attempted to defend the Corps' non-compliance with this Court's injunction by claiming that the Corps is now subject to conflicting injunctions, and is now forced into the choice of deciding which injunction to defy. See Emergency Motion, Exhibit 4 to Second Becker Dec., at 16-17. But contrary to the Corps' protestations, as set forth in detail in Plaintiffs' briefing in support of their application for preliminary injunction, this Court's ruling does not in fact subject the Corps to conflicting injunctions. As this Court properly concluded, the Nebraska District Court injunction did not encompass, and the Eight Circuit's review in State of South Dakota v. Ubbelohde, No. 02-2133 SD, 2003 WL 21276235 (8th Cir. June 4, 2003) ("South Dakota"), accordingly did not address, the Corps' responsibilities to comply with the Endangered Species Act. See slip op. at 65.

To avoid additional spinning of this issue by the Corps and continued non-compliance of the injunction issued by this Court, Plaintiffs request that this Court accompany its issuance of an order to show cause with a short explanation that there are no conflicting injunctions and that the Corps has a responsibility to implement its July 12 injunction - the only injunction that speaks to the Corps' legal obligations under the ESA. As discussed below, Nebraska sought and the Nebraska District Court granted the injunction on the assumption that the ESA would continue to

apply.  See Nebraska Complaint, ¶ 9 ("Although the Master Manual serves as the basis upon which the Corps must operate the main stem reservoirs of the Missouri River, it is subject  to NEPA and ESA."), attached as Ex. 5 to Second Becker Decl.

Additionally, as explained below, the Nebraska District Court injunction was based on the special facts associated with the Corps' 2002 Annual Operating Plan, was limited by its terms to that "current" AOP, and was entered without express consideration of the legal obligations of the ESA.  It is implausible that the Eighth Circuit Court intended that the Nebraska injunction apply to the 2003 AOP, and all future AOPs issued under the 1979 Master Manual, regardless whether future AOPs (including the 2003 AOP at issue in this case) violate the ESA.  Moreover, the Corps' own regulations require that the Master Manual comply with later-enacted statutes, such as the ESA, including regulations providing for the listings of the piping plover, least tern and pallid sturgeon.  And the Corps has, in fact, applied the Master Manual flexibly to allow for ESA compliance.[4]

Federal Defendants could only be held in contempt by the Nebraska Court if they were shown to violate a "clear and unambiguous" provision of its order by "clear and convincing evidence."  Under these circumstances, it is irresponsible for the Federal Defendants to suggest that this Court's injunction cannot be implemented without running afoul of a Nebraska District Court injunction that was issued in response to a Flood Control Act dispute, that calls on the Corps to follow the Master Manual for the "current" (i.e., 2002) water year, and which does not purport to interfere with the Corps' overriding responsibilities to apply its Master Manual in a manner that comports with its ESA responsibilities.  The Attorney General should not be seeking

---

[4] Ironically, the 2002 AOP that was the subject of the Eighth Circuit action states that the Corps will implement "additional water conservation measures *beyond the specific technical criteria* published in the current Master Manual" to address ESA needs.  See Exhibit 1416 of the Administrative Record, Plaintiff's Bench Book at PL 122.

to manufacture the specter of competing injunctions where none exists.  If the Federal

Defendants are truly unsure about whether the Eighth Circuit intended to override the ESA – as it

assuredly did not – Federal Defendants have a responsibility to bring that question before the

Court of Appeals in the Eighth Circuit.  (Plaintiffs understand that the time has not yet expired

for Defendants to request the Eighth Circuit to reconsider or clarify its decision.)

   Neither the Eighth Circuit nor the Nebraska District Court even hinted that they intended

to preclude compliance with the Endangered Species Act, and in fact the Nebraska District Court

indicated the opposite.  The Nebraska injunction and Eighth Circuit <u>South Dakota</u> decision

cannot form the basis for an effective exemption from the ESA or for the Corps' flagrant

disregard of this Court's injunction.  For the reasons stated below, the "conflicting injunction"

Defendants manufacture is not in fact a conflict at all and cannot form the basis for avoiding

contempt sanctions.

   1.   <u>The State Of Nebraska Explicitly Argued And The Nebraska Court
        Accepted That Operations Under The Master Manual Would Remain
        Subject To The ESA.</u>

   Defendants argue, in essence, that the Nebraska Court's injunction to follow the Master

Manual is in the nature of a "permanent" injunction that overrides any conflicting obligations

under the ESA. In making this argument, Defendants venture far a field of the facts and the law.

   The Nebraska District Court injunction was entered pursuant to a Complaint filed by the

State of Nebraska by a court that was distressed about the propensity of Missouri Basin States to

file "home court" litigations to obtain favorable results.   The factual problem of concern to

Nebraska was that a South Dakota injunction blocking releases of water from a major dam had

caused the Corps to reduce **spring** flows to an extremely low level (13,000 cfs as compared to

the 21,000 cfs summer flows at issue in this case).  One reason Nebraska was concerned was that

these low spring flows would expose low-lying sandbars in the spring and allow terns and

plovers to nest on them.  Once they had nested, the Corps would then be precluded by the ESA

from returning flows to higher levels all summer to avoid flooding out the nests.[5]  Nebraska

asked the Court to order higher flows in the spring not to override the ESA but to assure, as a

factual matter, that to meet the binding obligations of the ESA, the Corps would not need to

release equally low summer flows all summer.  That is why Nebraska specifically averred in its

complaint in that action at paragraph 9:    "Although the Master Manual serves as the basis upon

which the Corps must operate the main stem reservoirs of the Missouri River, it is subject  to

NEPA and ESA."  See Ex. 5 to Second Becker Decl.

    In entering the injunction, the Nebraska District Court agreed.  The Court found that the

low spring flows then occurring would allow tern and plover chicks to nest on low sandbars and

"the Corps may [therefore] be prevented from increasing the flow of the river until chicks have

sufficiently matured," i.e., because of the ESA, and that low flows (much lower than those at

issue in this case) would have to continue all summer in a way that harmed Nebraska interests.

State of Nebraska et al. v. Ubbelohde, Case No. 8:02CV217, slip op.  (D. Neb. May 13, 2002)

("Nebraska Opinion"), slip. op. at 4.  See Plaintiffs Materials submitted for July 2, 2003  Hearing

on Preliminary Injunction ("Bench Book"), Exhibit 6 to Pl. App., at PL 116.  In other words, far

---

[5]    Nebraska wrote in its application for a TRO, which the Court converted to an application
for a preliminary injunction:

> The piping plovers and interior least tern are federally listed
> respectively as threatened and endangered species.  Both species
> are known to nest on exposed gravel bars created by low flow
> conditions along the Missouri River. . . . Once the . . . species have
> established their nests on the gravel bars created by low flow
> conditions, the Corps will be unable to raise the water levels in
> Lewis and Clark Lake or on the Missouri River below Gavins
> Point Dam without inundating those nests and causing a 'take' of
> the species, in violation of the Endangered Species Act.

Nebraska's Application for a TRO, Case No. 8:02CV217, paragraphs 9 and 10, attached as Ex. 6
to Second Becker Decl.

from attempting to override the ESA, the Nebraska District Court's injunction was based on the premise that the ESA would apply no matter what – as specifically argued by the state.  (In fact, Federal Defendants could easily defeat any contempt motion filed by the State of Nebraska in the Nebraska District Court simply by pointing to Nebraska's own allegation that the Master Manual is subject to the ESA.)

Nothing in the Eighth Circuit decision changes this equation.  The Eighth Circuit held that Flood Control Act gave the Corps broad discretion to balance competing interests but that the legislative history indicated navigation and flood control were higher priorities.  It held that even though the Master Manual had never undergone notice and comment under the APA, the Corps behavior in treating the Master Manual as a rule had turned it into a rule, so the Corps could be enjoined to follow it.  But, as discussed below, the Eighth Court never considered whether the FCA or the Master Manual would override the ESA.  The Corps' obligation to follow the Master Manual stemmed from its obligation to follow any of its rules and does nor exempt the Corps from the ESA any more than any other rule.

This background shows conclusively not only that the Nebraska injunction, and its affirmance by the Eighth Circuit, were not intended to override the ESA but that the Nebraska Court assumed that the mandates of the ESA would continue to bind the Corps.

      2.    <u>The Nebraska Injunction Can Only Be Interpreted to Apply To The 2002 Water Year</u>

The only reasonable interpretation of the Nebraska court's ruling is that it applied to the Corps' River management decisions in the 2002 water year.  <u>See</u> Plaintiffs' Reply in Support of Application For Preliminary Injunction ("Reply") at 30-31.  The Nebraska injunction commands that the Corps not only "operate the Mainstem Reservoirs in accordance with the 1979 Master Manual" but also in accordance with the "current Annual Operating Plan."  <u>See</u> July 12, 2003

Memorandum Opinion granting preliminanry injunction ("Opinion") at 6; Plainitffs' Materials Submitted at July 2, 2003 Hearing on Application for Preliminary Injunction (the "Bench Book") at PL 118.   The injunction was issued on May 13, 2002, and the current Annual Operating Plan in place was the 2002 AOP.   In reaching its decision that an injunction was warranted because irreparable harm might ensure, the Nebraska court explicitly referenced facts unique to the 2002 water year – specifically, the potential drastic reduction in flow to 13 Kcfs in the May and June timeframe.   That court also keyed in on the specific issue that had raised concerns in the 2002 water year, namely, the Master Manual's process for deciding which reservoirs would be drained, in what order, for downstream flows.

The Nebraska court did *not* purport to find, nor could it have legally found, that the showing of irreparable harm that was made for the 2002 water year, and which justified an injunction against the 2002 AOP, automatically carries forward for future AOPs and for any deviation from the Master Manual, regardless of its nature or scope.   If the Corps had issued an AOP for 2003 that was identical to the 2002 AOP that had been before the Court, and if the circumstances of an sharp, early reduction in flows were again at issue, there would be a case that the injunction should be renewed.   But the Corps has moved on to a new AOP, and the issue before this Court is a modest reduction in flow in the summer, as called for by the 2000 Biological Opinion, rather than a much more drastic reduction in flow during May and June.[6]

---

[6] While various Intervenor defendants have suggested that the reference to a "current AOP" can mean any subsequent AOP, such an interpretation would require that the Nebraska District Court wished to validate and insulate from all judicial challenges any subsequently issued AOP without time limitation.   That too would be an untenable result.

3.　　There Is No Conflict Because The ESA Applies To Actions Under The Master Manual, And The Corps Has Discretion To Implement The Required Flow Reforms Under The Nebraska Injunction

In its motion for stay before the D.C. Circuit, the Federal Defendants rely heavily on language in the Nebraska Injunction that they claim *requires* maintenance of minimum navigation flows at all times, forever.  This interpretation is incorrect, and also cannot form the basis of avoiding contempt sanctions.  At a minimum, the Nebraska District Court injunction must be read as requiring navigation flows in conformity with the Master Manual.  To interpret otherwise, based on the plain language of the injunction, would elevate maintenance of "minimum navigation flows" above *all* other project purposes every single year, including those required for flood control.

However, the Master Manual was not intended to and cannot be construed to override the ESA.  First, the Eighth Circuit held only that the Master Manual has the force of a binding regulation, and that the Corps must adhere to that regulation absent changes made through proper Administrative Procedure Act process.  Even accepting the Eighth Circuit's view of the Master Manual (which Plaintiffs' do not),[7] the Master Manual is just that – a regulation – and provides no legitimate basis to nullify statutory obligations under the ESA based on the Corps' convenient assertion that a "conflict" exists.  It is axiomatic that an agency cannot eliminate its obligations to comply with the ESA simply by adopting a limited rule or policy document.  See generally Plaintiff's Reply in Support of its Application for Preliminary Injunction at 28-29.

Moreover, just as the Master Manual permits deviations from supporting minimum flows during droughts, and while it states that cutting fall flows during droughts is "preferable" to

---

[7] The Master Manual was not adopted pursuant to notice and comment rulemaking as required by the Administrative Procedure Act, rendering the Eighth Circuit's opinion that it is a binding regulation point questionable. CropLife America v. EPA, No. 02-1057, 2003 WL 21262716, at *1 (D.C. Cir. June 3, 2003).

cutting flows at other time, it does not preclude cutting flows at other times to meet minimum navigation flows.  Plaintiffs' Reply at 29.  If the Corps' argument were correct, then the Nebraska District Court injunction precludes compliance with the flood control provisions of the Master Manual because it mandates minimum navigation flows regardless of whether the Master Manual itself would call for cutting them back.  Such an argument is inconsistent with the very language of the Nebraska District Court injunction and is simply not tenable.

The same holds true for "minimum navigation levels."  Despite protests by the Corps that the Master Manual is so prescriptive that it strips the Corps of discretion to comply with the ESA by adjusting water levels as required by the 2000 BiOp, close examination of the terms of the Master Manual indicate otherwise.  <u>See</u> Reply at 31-32.  This Court explicitly found in granting the preliminary injunction that the Corps has substantial discretion in implementing the Master Manual and that flows to support barge navigation are not absolutely mandated.[8]  Opinion at 42-43.

Perhaps most fundamentally, the Master Manual was issued under the authority of  33 C.F.R. § 222, which require all Corps operations comply with "any applicable authorities established after project construction" and give "appropriate consideration to all applicable Congressional Acts."  33 C.F.R. § 222.5(f)(1).  Thus, the Corps' own regulations require operations under the Master Manual to comply with the ESA.  It is axiomatic that the Corps must follow its own rules, and the Manual and the Nebraska District Court injunction should be read to allow for such compliance.  In particular, the Master Manual's recognition that shortage situations and other events may require lower flows than otherwise prescribed are precisely the

---

[8] As explained in Plaintiffs' briefs, this Court's decision is fully consistent with  the long line of cases in which courts have interpreted agency regulations, guidance and contracts broadly so as to allow for ESA compliance and avoid an unnecessary conflict with the ESA. <u>See, e.g.,</u> Plaintiffs' Reply at 22-30.

type of provisions that the Corps, and the Courts, can and should reference when seeking to reconcile the Manual with the Corps' ESA responsibilities.

      C.    <u>Because Courts Construe Injunctions Narrowly, the Corps is Not At Risk of Contempt For Violating The Nebraska Injunction</u>

Finally, the Corps' concern that it will face contempt proceedings in Nebraska if it obeys this Court's injunction, <u>see</u> Exhibit 4 to Second Becker Decl. at 16-17, is unavailing, despite threats from Intervenor-Defendant the State of Nebraska to initiate contempt proceedings if the Corps lowers flow rates as required by this Court's injunction.  This concern would only merit consideration if the Nebraska injunction unambiguously required the Corps to maintain minimum navigation flows in all future years, under different AOPs, and despite any resulting violations of the ESA.  It does not.

It is well established that injunctions should be read narrowly, and should be tailored to specific factual circumstances, precisely to avoid concerns that they will affect conduct that is not the target of the injunction.  Rule 65(d) of the Federal Rules of Civil Procedure provides that "[e]very order granting an injunction shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the Complaint or other document, the act or acts sought to be restrained…"  As the Court of Appeals for the D.C. Circuit explained:

> The Supreme Court has explained the fundamental policies underlying Rule 65(d).  "The judicial contempt power is a potent weapon," the Court asserted.  "When it is founded upon a decree too vague to be understood, it can be a deadly one.  Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid."  …In the context of the litigation, an injunction's language might be sufficiently specific to notify the parties of the acts the court seeks to restrain.

DC\608836.1

<u>Common Cause v. Nuclear Regulatory Comm'n</u>, 674 F.2d 921, 927 (D.C. Cir. 1982) (quoting

<u>Int'l Longshoremen's Ass'n., Local 1291 v. Philadelphia Marine Trade Ass'n</u>, 389 U.S. 64, 76

(1967)).  Accordingly, courts have found that "[a] party seeking to hold another in contempt

faces a heavy burden, needing to show by 'clear and convincing evidence' that the alleged

contemnor has violated a 'clear and unambiguous' provision of the consent decree."  <u>United

States v. Microsoft Corp.</u>, 147 F.3d 935, 940 (D.C. Cir. 1998) (citation omitted).  The same holds

true in the Eighth Circuit. <u>See</u>, <u>e.g.</u>, <u>I. B. E. W. v. Hope Elec. Corp.</u>, 293 F.3d 409, 418 (8th Cir.

2002) (<i>rehearing and rehearing en banc denied</i>) (stating that "contempt orders must be based

upon a party's failure to comply with a clear and specific underlying order"); <u>Imageware, Inc. v.

U.S. West Communications</u>, 219 F.3d 793, 797 (8th Cir. 2000) (reversing a finding of civil

contempt and a fine of civil sanctions because "[n]o one should be held in contempt for violating

an ambiguous order . . . [a] contempt should be clear and certain.").

        Quite unlike this Court's injunction, which is crystal-clear in its requirements and which

the Corps has affirmatively indicated it understands, the Nebraska court's injunction is hardly

"clear and unambiguous."  Indeed, the very existence of the dispute in this case over the precise

scope of that injunction indicates its vagueness and uncertainty, and demonstrates that the Corps

would not appropriately be held in contempt in Nebraska for following this Court's injunction

and fulfilling the requirements of the ESA.  As this Court noted, the fact that the Corps finds

itself in this situation is "a problem of its own making," Opinion at 65.  If the Corps truly has

concerns that the Eighth Circuit's ruling in <u>South Dakota</u> overrode the ESA – without even

addressing the issue – it is incumbent on the Corps to seek clarification of that issue in that

jurisdiction.

DC\608836.1

For all these reasons, the Nebraska injunction does not actually conflict with this Court's injunction, and the Corps' compliance with this Court's injunction would not subject it to contempt in Nebraska.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request this court to issue an order requiring the Corps to show cause why they should not be held in contempt of this court's July 12, 2003 order and sanctioned for their conduct. Specifically, Plaintiffs seek an order finding the Corps in contempt, and imposing daily fines, beginning at 12:00 A.M. on July 15, 2003, on the Corps and the Federal Defendants unless they comply immediately with this Court's order. Plaintiffs also encourage this Court to rule specifically that the Nebraska injunction is not conflicting.

Dated: July 18, 2003                                          Respectfully Submitted,

_____/s/_____                _____/s/_____
Timothy D. Searchinger                                      David J. Hayes (D.C. Bar No. 252130)
(D.C. Bar No. 421805)                                       Julia A. Hatcher (D.C. Bar No. 412755)
ENVIRONMENTAL DEFENSE                                Janice M. Schneider (D.C. Bar. No. 472037)
1875 Connecticut Avenue, N.W.                          David A. Becker (D.C. Bar No. 456396)
Washington, D.C. 20009                                     Cassandra Sturkie (D.C. Bar No. 472884)
Phone:  (202) 387-3500                                      LATHAM & WATKINS LLP
Facsimile:  (202) 234-6049                                 555 Eleventh Street, N.W., Suite 1000
                                                                          Washington, D.C. 20004-1304
Counsel for Plaintiff                                          Phone:  (202) 637-2200
Environmental Defense                                       Facsimile:  (202) 637-2201

                                                                          Counsel for Plaintiffs
                                                                          American Rivers,
                                                                          National Wildlife Federation,
                                                                          Iowa Wildlife Federation,
                                                                          Kansas Wildlife Federation,
                                                                          Montana Wildlife Federation,
                                                                          Nebraska Wildlife Federation,
                                                                          North Dakota Wildlife Federation,
                                                                          South Dakota Wildlife Federation,
                                                                          and Izaak Walton League of America

## <u>CERTIFICATE OF SERVICE</u>

I, Irfan Gulsen, hereby certify that true copies of the foregoing were served this 18th day of July, 2003, on the following:

### <u>BY FIRST CLASS U.S. MAIL, POSTAGE PAID:</u>

William J. Bryan
U.S. ATTORNEY'S OFFICE/MO
Supreme Court Building
P.O. Box 899
Jefferson City, MO 65102

### <u>BY E-MAIL NOTICE:</u>

**Donald G. Blankenau**
dblankenau@fclaw.com

**Charles Michael Carvell**
ccarvell@state.nd.us

**David D. Cookson**
dcookson@notes.state.ne.us

**Fred Russell Disheroon**
fred.disheroon@usdoj.gov

**Jodi M. Fenner**
jfenner@notes.state.ne.us

**Sam Kalen**
smk@vnf.com

**James R. Layton**
james.layton@mail.ago.state.mo.us

**James A. Maysonett**
james.a.maysonett@usdoj.gov

**Thomas R. Wilmoth**
twilmoth@fclaw.com

_____/s/ Irfan Gulsen_____