# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AMERICAN RIVERS, et al.,** | : |
| | : |
| **Plaintiffs,** | : |
| | : |
| **v.** | :   **Civil No. 03-241 (GK)** |
| | : |
| **UNITED STATES ARMY CORPS** | : |
| **OF ENGINEERS, et al.,** | : |
| | : |
| **Defendants.** | : |

**ORDER**

Plaintiffs, a number of national and local environmental organizations, brought suit against the United States Army Corps of Engineers ("Corps"), the Secretary of the United States Army, the United States Fish and Wildlife Service ("FWS"), and the Secretary of the Interior, seeking to protect the endangered least tern, the endangered pallid sturgeon, and the threatened Great Plains piping plover, all of which are protected by the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, et seq. Plaintiffs allege that the manner in which the Corps has operated the extensive dam and reservoir system on the Missouri River and the manner in which the FWS has carried out its statutory responsibilities under the ESA have adversely impacted the three species in question. Plaintiffs assert claims against the Corps and the Secretary of the Army under the ESA, the Flood Control Act of 1944, 33 U.S.C. §§ 701, et seq, and the Administrative Procedure Act, 5 U.S.C. §§ 701, et seq, and

assert ESA and APA claims against FWS and the Secretary of the Interior.

This matter is now before the Court on Plaintiffs' Motion for Preliminary Injunction and Defendants' Motions to Strike.   A motions hearing in this matter was held on July 2, 2003.   Upon consideration of the Motions, Oppositions, Replies, <u>amicus</u> <u>curiae</u> and intervenor briefs, the arguments presented at the motions hearing, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED**, that Defendants' Motions to Strike **[#58,60]** are **denied as moot;** and it is further

**ORDERED** that Plaintiffs' Motion for Preliminary Injunction **[#47]** is **granted.**   The Corps is hereby enjoined from implementing the summer water flow provisions of the revised 2003 Annual Operation Plan, from taking any action that would implement or be consistent with the provisions relating to summer water flow contained in the 2003 Supplemental Biological Opinion, and from taking any action that would be inconsistent with the provisions relating to summer water flow contained in the 2000 Biological Opinion.

<u>  7/12/2003  </u>                          <u>          /s/          </u>
DATE                                 GLADYS KESSLER
                                     UNITED STATES DISTRICT JUDGE

**Copies To:**

David A. Becker, Esq.
David John Hayes, Esq.
Janice M. Schneider, Esq.
Julia A. Hatcher, Esq.
Latham & Watkins
555 Eleventh Street, N.W.
Suite 1000
Washington, D.C.   20004

Timothy D. Searchinger, Esq.
Environment Defense
1875 Connecticut Avenue, N.W.
Washington, D.C.   20009

Fred Russell Disheroon, Esq.
U.S. Department of Justice
Environment and Natural Resource Division
601 D Street, N.W.
Washington, D.C.   20004

James A. Maysonett, Esq.
U.S. Department of Justice
Environment & Natural Resources Division
Post Office Box 7369
Ben Franklin Station
Washington, D.C.   20044-7369

Charles M. Carvell, Esq.
ND Office of Attorney General
500 North Ninth Street
Bismarck, North Dakota   58501-4509

Joseph P. Bindbeutel
William J. Bryan
Shannon L. Haney
Missouri Attorney General's Office
Eighth Floor, Broadway Building
Post Office Box 899
Jefferson City, Missouri   65102

David D. Cookson
Attorney General's Office
2115 State Capitol
Lincoln, Nebraska   68509

-3-

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN RIVERS, et al.,           :
                                   :
              Plaintiffs,          :
                                   :
        v.                         :    Civil No. 03-241 (GK)
                                   :
UNITED STATES ARMY CORPS           :
OF ENGINEERS, et al.,              :
                                   :
              Defendants.          :

## MEMORANDUM OPINION

Plaintiffs, a number of national and local environmental organizations,[1] brought suit against the United States Army Corps of Engineers ("Corps"), the Secretary of the Army, the United States Fish and Wildlife Service ("FWS"), and the Secretary of the Interior (collectively, "Defendants" or "Federal Defendants"), [2] seeking to protect the endangered least tern, the endangered pallid sturgeon, and the threatened Great Plains piping plover, all of

---

[1]     Plaintiffs are American Rivers, a national river conservation organization; Environmental Defense, a national conservation organization; National Wildlife Federation ("NWF"), a national conservation advocacy and education organization; Iowa Wildlife Federation, Kansas Wildlife Federation, Montana Wildlife Federation, Nebraska Wildlife Federation, North Dakota Wildlife Federation, and South Dakota Wildlife Federation, state affiliates of NWF; and Izaak Walton League of America, a national conservation organization, Maryland.  Compl. at ¶ 13.

[2]     In addition to the primary parties, there are numerous intervenors and cross-claimants in this action.  With regard to the Motions presently before the Court, the States of Nebraska and Missouri and the Missouri River Energy Service have filed briefs as Defendant Intervenors; the State of North Dakota has filed a brief as a Plaintiff-Intervenor.

which are protected by the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, et seq. Plaintiffs allege that the manner in which the Corps has operated the extensive dam and reservoir system on the Missouri River and the manner in which the FWS has carried out its statutory responsibilities under the ESA have adversely impacted the three species in question. Plaintiffs assert claims against the Corps and the Secretary of the Army under the ESA, the Flood Control Act of 1944 ("FCA"), 33 U.S.C. §§ 701, et seq, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, et seq, and assert ESA and APA claims against FWS and the Secretary of the Interior.

This matter is now before the Court on Plaintiffs' Motion for Preliminary Injunction and Defendants' Motions to Strike.[3] A motions hearing in this matter was held on July 2, 2003. Upon consideration of the Motions, Oppositions, Replies, amicus curiae and intervenor briefs, the arguments presented at the motions hearing, and the entire record herein, for the reasons discussed below, Plaintiffs' Motion for Preliminary Injunction is **granted**, and Defendants' Motions to Strike are **denied as moot**.

---

[3] Federal Defendants' Motion to Strike Extra-Record Evidence, and State of Nebraska's Motion to Strike the Declarations in Support of Plaintiffs' Application for Preliminary Injunction both seek to strike expert declarations that Plaintiffs submitted with their Motion for Preliminary Injunction.

-2-

**I.   SUMMARY**

This is an immensely difficult case with great ramifications
for the Missouri River Basin.   Because of its complexity, it is
important to clarify and summarize the factual and legal issues
presented.

The Missouri River Basin--one of the largest and most
bountiful in our country--is home to hundreds of species of birds,
fish and insects, as well as the habitat which supports their
existence.   Three of those species--the least tern, the Great
Plains piping plover, and the pallid sturgeon--are in great danger
of extinction.

In 2000 the Fish and Wildlife Service issued, pursuant to the
Endangered Species Act, a comprehensive Biological Opinion
outlining what measures must be taken by the Corps of Engineers in
its management of the Missouri River to insure the survival of
those three species.  These measures are necessary to both protect
the three species from further harm and to affirmatively take
action to insure their recovery.  The Biological Opinion considered
time to be of the essence in implementing them.   The 2000
Biological Opinion was peer reviewed by government scientists and
by an arm of the National Academy of Sciences.  It is undisputed
that all parties consider it to be the controlling biological
opinion.

-3-

A central premise on which the 2000 Biological Opinion rests is the need to change the Corps' management of the Missouri River. In particular, the 2000 Biological Opinion calls upon the Corps to institute a water management regimen in which water flows will rise in the spring at least once every three years and decrease every summer. Adoption of this operating principle would: encourage breeding of the least tern and piping plover in the spring; avoid flooding of their nests and habitat, as well as killing of their chicks, in the summer; increase the numbers of prey-fish available for juvenile pallid sturgeon to feed on; and provide a more receptive environment in which juvenile pallid sturgeon would thrive.

In October of 2002, the Corps released a draft Annual Operating Plan for the River presenting two potential flow regimes. Neither plan implemented the spring rise or summer flow regime that the 2000 Biological Opinion found necessary to protect the three species from extinction. When the Corps released its final Annual Operating Plan in January 2003, it contained no provision for a spring rise and low summer flow regime for managing the River. Plaintiffs in this case then filed suit, seeking to force the Corps and FWS to comply with federal law and protect these three endangered and threatened species.

In 2003, the Fish and Wildlife Service did a total about-face, issuing a new Biological Opinion that reversed the position it took

-4-

in 2000.   Looking only at Corps activities in the summer of 2003,
FWS concluded that the three species could survive one more summer
without the summer low flow that was previously deemed essential to
both avoid current harm and advance future recovery.   Moreover, FWS
stated that its change of position rested on the assumption that
the Corps' future management of river flows would be consistent
with the recommendations made in the 2000 Biological Opinion.

There is no question that the three species (the least tern,
the piping plover, and the pallid sturgeon) will suffer irreparable
harm if the Corps is allowed to carry out its 2003 Annual Operating
Plan.    Two of those species--the least tern and the pallid
sturgeon--have been declared "endangered" under the Endangered
Species Act and are on the verge of extinction; the piping plover
has been declared "threatened," which means that without
protection, it will also face extinction.   There is no dollar value
that can be placed on the extinction of an animal species--the loss
is to our planet, our children, and future generations.

Upon analysis of the lengthy legal arguments presented by all
parties, the Court finds that there is a substantial likelihood
that Plaintiffs will prevail on the merits of their case for the
following reasons: FWS has failed to adequately explain or justify
its reversal of position from its 2000 Biological Opinion to its
2003 Biological Opinion; FWS' 2003 Supplemental Biological Opinion
is premised on a totally baseless assumption--namely that the Corps

-5-

will adopt a River management plan for 2004 that will be consistent
with the 2000 Biological Opinion; and FWS' 2003 Supplemental
Biological Opinion improperly segments its analysis and narrowly
focuses on harms to the species only during this summer instead of
considering all present and future effects on the three imperiled
species. Finally, because the 2003 Supplemental Biological Opinion
is arbitrary and capricious, it cannot serve to validate the Corps'
management plan that will lead to harm of these three species in
violation of the Endangered Species Act.

    In addition to the irreparable harm to the three protected
species and the likelihood that Plaintiffs will ultimately succeed
in their case against the Corps and FWS, the Court must also
consider and balance the various impacts of granting an injunction.
There is no question that other interests will suffer if the
preliminary injunction that Plaintiffs request is granted.
Commercial and consumer interests in the lower Basin states, such
as Nebraska and Missouri, will be affected. Navigation will be
interrupted for the remainder of the summer and barge companies
will lose revenues. Water quality may be affected and there may
well be higher water purification costs. Hydroelectric resources
will be affected, and consumers may suffer higher costs. However,
despite a similar--but shorter--interruption of high water flows
last summer caused by drought, none of the Defendants or
Intervenors could provide the Court with reliable figures on the

-6-

extent or certainty of losses.   Significantly, when the Corps previously examined the effects of implementing a management plan with summer low flow, it concluded that it would produce an overall net economic benefit to the entire Missouri River Basin.

Balancing the irreplaceable and unquantifiable loss of three species against the concrete--albeit uncertain--impacts on consumers, businesses, and the economies of several States is a daunting task.   However, the loss of species is just that-- irreplaceable.  The American people, through their representatives in Congress, have spoken in the "plainest of words" making it abundantly clear that the protection and preservation of endangered species is one of the nation's highest priorities.   Tennessee Valley Authority v. Hill, 437 U.S. 153, 194 (1978).   For these reasons, as more thoroughly explained in this Memorandum Opinion, the Court concludes that the Plaintiffs' request for a preliminary injunction should be granted.

## II.   BACKGROUND

The Missouri River flows 2,340 miles from its head waters near Three Forks, Montana, to its confluence with the Mississippi River at St. Louis, Missouri.  The Missouri River Basin covers the states of Colorado, Iowa, Kansas, Minnesota, Missouri, Montana, Nebraska, North Dakota, South Dakota, and Wyoming, as well as a small part of Canada.   Approximately ten million people, including 28 Native American Tribes, live in the Basin.

## A.    The Flood Control Act

Pursuant to the FCA, Pub.L. No. 78-534, 58 Stat. 887 (1944), and several other federal statutes, Congress entrusted the Corps with managing the Missouri River Basin through its construction and operation of the Missouri River Main Stem System of Dams and Reservoirs ("Main Stem System").  58 Stat. 591.  In completing the Main Stem System, the Corps constructed six dams and reservoirs on the upper part of the Missouri River and narrowed and deepened the lower part of the river for commercial barging.[4]  Under the FCA, the Corps is responsible, not only for constructing and managing various dams and their corresponding reservoirs, 16 U.S.C. § 460d, but also for contracting for use of surplus reservoir water and promulgating regulations for the use of water stored in the reservoirs, 33 U.S.C. § 708, 709.  The FCA also identified various substantive interests that the Corps was to consider in managing the Missouri River Basin, such as flood control and navigation, as well as irrigation, recreation, fish, and wildlife.  See 58 Stat. at 889-91.  Thus, in enacting the FCA, Congress "provided the Corps with a wide array of interests to consider in regulating the

_____

[4]   The dams and their associated reservoirs are located in Montana, North Dakota, South Dakota and Nebraska.  They include Ft. Peck Dam (Ft. Peck Lake), Garrison Dam (Lake Sakakawea), Oahe Dam (Lake Oahe), Big Bend Dam (Lake Sharpe), Ft. Randall Dam (Lake Francis Case), and Gavins Point Dam (Lewis & Clarke Lake).

River."  South Dakota v. Ubbelohde, 330 F.3d 1014, 1020 (8th Cir. 2003).

### 1.  The Master Manual and Annual Operating Plans

In order to fully consider the wide array of interests the FCA requires the Corps to balance in its management of the Missouri River, the Corps adopted a specific management plan, called the Missouri River Main Stem Reservoir System Reservoir Regulation Manual, or Master Manual, in 1960.  Section 9 of the Master Manual sets out a general approach for reservoir operation projects, with a sequential consideration of the various interests identified in the FCA itself.  Thus, the Master Manual directs the Corps to consider, in order of priority, flood control, irrigation, water supply and water-quality requirements, navigation and power, and finally recreation, fish, and wildlife.  See Fed. Defs.' Ex. 2 ("Master Manual") at IX-1,2.

In addition to this general approach, the Master Manual includes specific technical guidelines for minimum water flows that are to be maintained along the River and methods for calculating the length of the navigation season based upon that minimum water flow at certain times of the year.  Master Manual Section at IX-6- 9.  The Master Manual also directs the Corps to develop Annual Operating Plans ("AOPs"), describing the Corps' management plan for operating the Missouri River water flow in each water year.  Master Manual at IX -20, pts. 9-47, 48.

-9-

Since its original promulgation in 1960, the Corps has revised the Master Manual three times--in 1973, 1975, and 1979. The Corps has been in the process of producing the latest revision of the Master Manual since the late 1980's. However, after more than ten years of work and multiple assurances to various courts that the latest revision would soon be completed, see South Dakota v. Bornhoft, No. CV 91 26 JDS-BLG, slip op. (D. Mont. Feb. 3, 1993), Ex. 7 to Pls.' Schneider Decl. and Ubbelohde, 330 F.3d at 1020, the Corps has not yet completed its revision of the Master Manual. The present management of the River is still based on the general approach articulated in the 1979 version of the Master Manual.

## 2. Prior FCA Litigation Involving the 2002 AOP

In response to severe drought conditions that the Missouri River Basin has been experiencing for the past few years, a series of cases were filed in the courts of the Eighth Circuit during the 2002 water year, challenging the Corps' operation of the Main Stem System under the APA and the FCA.[5] The unavoidable management constraints caused by the drought led to sharp conflicts amongst the Upper Basin and Lower Basin states as to the priority to be given in the Corps' formulation of the 2002 AOP for allocating the limited supply of water from the Missouri River.

---

[5] For a thorough description of the various cases against the Corps relating to the 2002 Water Year, see Ubbelohde, 330 F.3d at 1020-22.

-10-

The Corps' 2002 AOP provided that water from a reservoir in South Dakota would be released to maintain downstream navigation on the Missouri River while water levels at the other five reservoirs would be held constant. In order to protect recreational fishing interests, the State of South Dakota filed suit in the federal District Court in South Dakota, and the District Court entered a temporary restraining order, and then a preliminary injunction, requiring the Corps to maintain the water level at South Dakota reservoirs until the end of the spawning season. See, generally, Ubbelohde, 330 F.3d at 1021 (describing the events in South Dakota v. Ubbelohde, Civ. No. 02-3011 (D.S.D.)).

The Corps then announced plans to lower water levels in a North Dakota reservoir in order to achieve the same goal and, predictably, the State of North Dakota brought suit in the federal District Court in North Dakota to enjoin the Corps from lowering the reservoir. The District Court in North Dakota then entered a temporary restraining order, which was later converted into a preliminary injunction, requiring the Corps to maintain that reservoir's water level. See, generally, Ubbelohde, 330 F.3d at 1021-22 (describing the events in State of North Dakota v. Ubbelohde, Civ. No. A1-02-059 (D.N.D.)).

In response to these injunctions that would have harmed downstream navigation interests, the State of Nebraska went to the federal District Court in Nebraska seeking to require the Corps to

-11-

manage the Missouri River according to the Master Manual and the 2002 AOP. The District Court in Nebraska subsequently entered an injunction ordering the Corps to abide by the Master Manual and 2002 AOP to provide for downstream navigation. See, generally, Ubbelohde, 330 F.3d at 1022 (describing the events in Nebraska v. Ubbelohde, Case No. 8-02CV217 (D. Neb.)).

The Corps immediately appealed each of these injunctions and the Eighth Circuit stayed them on May 22, 2002, noting that "the injunctions in North Dakota and South Dakota expired by their own terms on May 25, 2002," although the injunction in Nebraska did not expire. Ubbelohde, 330 F.3d at 1022. On June 4, 2003, the Eighth Circuit struck down the North Dakota and South Dakota injunctions while upholding the Nebraska injunction. The court found that the North Dakota and South Dakota injunctions were not based on a likelihood of success on the merits. The court held that the 2003 AOP was not arbitrary and capricious because the Corps had "provided a rational basis for its decision to lower one reservoir per year during drought conditions." Id., at 1032. The court also found that the Nebraska District Court's injunction was appropriate because the Master Manual was binding upon the Corps, and therefore the Corps could be ordered to "abide by its own formally adopted policies" in the Master Manual requiring it to manage the River to maintain downstream navigation. Id., 330 F.3d at 1033. The

Endangered Species Act was never mentioned in the Eighth Circuit opinion.


### B.    The Endangered Species Act

In 1973, Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered and threatened species." 16 U.S.C. § 1531(b).    At that time, the ESA "represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tennessee Valley Authority v. Hill, 437 U.S. 153, 180 (1978)("TVA").

Under Section 4 of the ESA, the appropriate government agency, in this case FWS, conducts a review of the species' biological status and threats to its existence, and then lists the species as either threatened or endangered based on the "best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). Section 4 also requires the listing agency to designate "critical habitat" for endangered and threatened species, i.e., those areas with physical and/or biological features essential for conservation of the species. 16 U.S.C. § 1533(b)(2). Subsequently, listed species and critical habitat are afforded considerable protections, and all

-13-

federal agencies must assume special responsibilities to conserve them.

Under Section 7 of the ESA, every federal agency must "insure" that "any action authorized, funded, or carried out by such agency...is not likely to jeopardize the continued existence of the endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). In order to avoid jeopardy to endangered and threatened species, federal agencies are required to verify that their actions will not jeopardize any listed species by consulting with and obtaining the assistance of specific federal consultation agencies, such as the Secretary of Interior acting through the FWS. 16 U.S.C. § 1536(4). Federal agencies must use "the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), to determine if any listed species is present in the area affected by a proposed project and must confer with the Secretary whenever an action is likely to affect such a species. 16 U.S.C. § 1536(a)(3).

As a result of Section 7's consultation requirement, FWS formulates a Biological Opinion ("BiOp")--a comprehensive examination of "whether the action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat."  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.02.  If the BiOp concludes

-14-

that the proposed agency action will jeopardize a listed species, the BiOp must include the reasonable and prudent alternatives ("RPAs"), "if any," to the agency's action plans.  Id.

Under Section 9 of the ESA, it is unlawful for any person to "take" a listed species.  16 U.S.C. § 1538(a)(1)(B).  Accordingly, if FWS determines that the action agency's implementation of RPAs could still result in "an incidental taking" of the listed species, FWS must issue an Incidental Take Statement.  That Statement authorizes a specified level of "incidental take" of listed species that "result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency." 50 C.F.R. § 402.02; see also 16 U.S.C. § 1536(b)(4).  An incidental take statement must specifically state the impact that agency take will have on the species, identify the "reasonable and prudent measures" ("RPMs") considered necessary to minimize the expected impact, and establish "terms and conditions" necessary for implementation of the RPMs. 16 U.S.C. § 1536(b)(4); see also 50 C.F.R. § 402.14(i).  Under the ESA, a take that complies with an Incidental Take Statement is exempt from the ESA's prohibitions and penalties against taking a listed species, 16 U.S.C. § 1536(o)(2). If the agency fails either to implement the RPMs or to comply with the terms and conditions of the statement, any take is unlawful. 50 C.F.R. § 402.14(i)(5).

## 1.  Listing of Species in the Missouri River Basin

Since the enactment of the ESA, a number of species that reside in the Missouri River Basin have been listed as threatened or endangered due to the Corps' physical alteration of the Missouri River and its manipulation of the River's water flow.

In 1985, FWS listed the least tern (Sterna antillarum), a small, fish-eating bird that historically nested on exposed sandbars on the Mississippi and Missouri Rivers. In listing the tern as endangered, FWS found that the Corps' alteration of Missouri River flow patterns had destroyed the sandbars necessary for the species to nest and raise its chicks. 2000 BiOp at 84.

The Great Plains piping plover (Charadrius melodus) is a migratory bird, which grows to approximately seven inches in length and, like the least tern, uses exposed sandbars for its nesting and forage sites. In 1986, FWS listed the Great Plains piping plover as threatened, finding that the Corps' "[d]amming and channelization of rivers [had] eliminated nesting sandbar habitat along hundreds of miles of rivers in the Dakotas, Iowa, and Nebraska." 50 Fed. Reg. 50,731. Subsequently, in September 2002, FWS designated approximately 767 miles of the Missouri River as critical habitat for the piping plover, finding that the features and habitat characteristics of those portions of the Missouri River were essential to plover survival. 67 Fed. Reg. 57,638, 57,642.

The pallid sturgeon (Scaphirhynchus albus) is a large fish that exists primarily in the Missouri River, can live more than

-16-

fifty years, and can grow to more than six feet in length and 80
pounds in weight.  Pallid sturgeon naturally spawn in the spring,
cued by rising water levels and water temperatures, 2000 BiOp at
103, and juvenile sturgeon spend the summer and fall in shallow,
slow flowing water foraging on populations of small fish found in
those waters.   2000 BiOp at 112-113.   In 1990, FWS listed the
pallid sturgeon as endangered, finding that "[a]lteration of
habitat through river channelization, impoundment, and altered flow
regime has been a major factor in the decline of this species."  55
Fed. Reg. 36,645.

### 2.   History of the Corps' ESA Consultation for the Missouri River Basin

#### a.   The 1990 BiOp

In 1989, the Corps initiated formal consultation with FWS
under Section 7 of the ESA, after FWS listed the tern and plover
under the ESA.  In November 1990, FWS issued a biological opinion
(the "1990 BiOp") and concluded that the Corps' dam operations on
the Missouri River were jeopardizing the survival of the two listed
birds by directly "taking" these species through flooding of their
nests and damaging their habitats in other enumerated ways.   2000
BiOp at 5, 206.

Beginning in 1991, FWS advised the Corps that it needed to
supplement the 1989 consultation for the following reasons:   the
listing of the pallid sturgeon as an endangered species, the Corps'
lack of compliance with the bird RPAs in the 1990 BiOp, and

-17-

"significant changes to [the Corps'] annual operations since 1990 [BiOp]." 2000 BiOp at 1.   The Corps initiated informal consultations relating to its specific actions managing the Missouri River but held off initiating a formal consultation until "sufficient data on project effects and pallid sturgeon life history and habitat use were available as part of the Master Manual Review and Study." Id.

In 1993, the Corps initiated formal ESA Section 7 consultation with FWS regarding revision of the Master Manual, and in April 1994, FWS produced a draft BiOp to be used in the Master Manual revision process.   2000 BiOp at 7, 9.   However, after numerous extensions of the Master Manual consultation, the Corps never provided any comments on the 1994 draft BiOp. Id. at 10.  In 1997, FWS requested that the Corps reinitiate consultation under the present Master Manual (which was still the 1979 version), given that the   "(1) reasonable and prudent alternatives of the 1990 consultation and Biological Opinion for meeting interior least tern and piping plover fledge ratios and habitat have not been met, (2) reasonable and prudent measures to minimize take have not been met, (3) the terms and conditions that implement the reasonable and prudent measures have not been met, and (4) the Corps has not complied with the annual reporting requirements of the reasonable and prudent alternatives." Ex. 9 to Pls.' Schneider Decl. at 1 (letter from FWS to the Corps).  Finally, in March 2000, the Corps

-18-

reinitiated consultation with FWS under the still-existing 1979 version of the Master Manual.  Id. at 24.

####     b.    The 2000 BiOp

In November 20000, FWS issued the 2000 BiOp, which concluded that the Corps' management of the Missouri River under the 1979 version of the Master Manual was "likely to jeopardize the continued existence of the least tern, piping plover, and pallid sturgeon." 2000 BiOp, Executive Summary at 1-2.  In the 2000 BiOp, FWS presented an RPA with multiple parts that was "designed to return some semblance of practical 'form and function' of a river system" that through a "combination of all parts of the [RPA], working in concert, [would] eliminate jeopardy to the [three] species." Id. at 2.

The five parts of the RPA contained in the 2000 BiOp are: 1) flow enhancement through a spring rise and summer low flow which is necessary to restore "spawning cues for fish, maintain and develop sandbar habitat for birds and fish,...and improve habitat conditions for summer nesting terns and plovers, forage availability, and fish productivity," 2) habitat restoration, creation, and requisition, with a goal of "20-30 acres of shallow water [] per mile," 3) unbalanced system regulation for water levels at the upper three reservoirs "by holding one reservoir low, one at average levels, and one rising on a 3-year rotation," 4) adaptive management and monitoring which would allow the Corps to efficiently modify and implement management plans "in response to new information and to new environmental conditions to benefit the

-20-

species," and 5) increased propagation and augmentation of pallid sturgeon. Id. at 2-3.

The Incidental Take Statements included in the 2000 BiOp allowed the Corps to harm a limited number of each of the three listed species, so long as the RPA was implemented. Id. at 270, 276-77. Finally, while noting the necessity to implement the flow changes for protecting the species as soon as possible, FWS still gave the Corps until the 2003 water year to implement the yearly low summer flow and once per three year spring rise. Id. at 243.

FWS' findings in the 2000 BiOp were supported by two independent scientific reviews. First, a panel of scientists chosen jointly by FWS and the Corps concluded that restoring a more natural flow regime to the Missouri River was necessary for the survival and recovery of the three listed species. See, generally, 2000 BiOp, App. V. Second, the National Academy of Sciences' ("NAS") review of the 2000 BiOp confirmed that the Corps' current management of river flow, if unchanged, would cause jeopardy to the three listed species. See, generally, National Research Council, "The Missouri River Ecosystem: Exploring the Prospects for Recovery" (2002) ("NAS Report"), Ex. 2 to Pls.' Keenlyne Decl. NAS concluded that a more natural water flow needed to be implemented on the Missouri River to stop degradation of the habitat and cautioned that without changes to flow regime, the Missouri River ecosystem "faces the prospect of irreversible extinction of species." NAS Report at 3.

-21-

After FWS issued the 2000 BiOp, the Corps analyzed the economic impact the summer low flow regime would have on hydroelectric power, water supply, flood control, navigation, and recreation interests. In August 2001, the Corps issued its revised draft environmental impact statement ("RDEIS") for the Missouri River Basin. See RDEIS, Ex. 2 to Pls.' Schneider Decl. The Corps concluded that implementation of the flow changes required by the 2000 BiOp, instead of continuing with the management regime articulated in the Master Manual, would produce a total net economic benefit for the entire Missouri River Basin system of approximately $8.8 million annually. RDEIS at 5-131, Table 5.13-1. In addition, the Corps found that implementation of the 2000 BiOp's adaptive management flow regime would reduce the economic benefits of flood control approximately 1%. See RDEIS at 26.

### 3.    The 2003 Water Year and Plaintiffs' Present Lawsuit

#### a.    The 2003 AOP

On October 3, 2002, the Corps released a draft 2003 AOP to the public.   The draft 2003 AOP outlined two potential flow regimes that would be implemented for the 2003 water year in order to "meet minimum services to navigation from 1 April through 1 December 2003," Ex. 10 to Pls.' Schneider Decl. at 1 (letter from Corps to FWS). Neither of these two options implemented the spring rise or low summer flow regime required by the 2000 BiOp's adaptive management RPA.

-22-

The first plan called for a steady, high-flow release of reservoir water for the entire summer, while the second plan abandoned a high steady flow regime in favor of a variable "flow-to-target" regime, in which the Corps would release water at the rate required to meet specific navigation targets downstream.  See, generally, 2002-2003 AOP, Ex. 11 to Pls.' Schneider Decl.  While the terms of the 2000 BiOp allowed the Corps to delay implementation of a spring rise due to the continuing drought in the Missouri River Basin, no such exception for lack of a summer low flow was included in the 2000 BiOp.  However, the Corps still asserted that its draft 2003 AOP was in compliance with the 2003 Supplemental BiOp.  Ex. 10 to Pls.' Schneider Decl. at 2 (letter from Corps to FWS).

On November 7, 2002, Plaintiffs filed a 60-day notice letter with the Corps, indicating their intent to sue under the ESA for the 2003 AOP's non-compliance with the 2000 BiOp.  See 15 U.S.C. § 1640(g)(2)(A)(i) (requiring that under the statute's citizen suit provision, plaintiffs give federal defendants notice of their intent to sue at least 60 days before filing an ESA action).  In January 2003, the Corps released the final 2003 AOP, which contained the two alternative flow regimes identified in the draft AOP and did not include any plan that conformed to the low summer

flow articulated in the 2000 BiOp.  Accordingly, Plaintiffs filed
the present action on January 12, 2003.[6]

> ### b.    ESA Consultation on the 2003 AOP, the Corps'
> ### Revised Operating Plan for 2003, and the 2003
> ### Supplemental BiOp

Shortly after Plaintiffs filed this ESA action, the Corps
provided FWS with the information necessary to carry out the formal
consultation it had requested earlier, after recognizing that the
alternatives outlined in the 2003 AOP "might also affect two
endangered species--the interior least tern and the piping plover."
Fed. Defs.' Opp'n at 9-10.[7]  As a result of this consultation, the
Corps issued an Additional Supplemental Biological Assessment for
the 2003 AOP on April 4, 2003, and FWS issued a 2003 Supplemental
BiOp on April 21, 2003.[8]

The Additional Supplemental Biological Assessment for the 2003
AOP presented a revised operating plan for the remainder of the
2003 water year.  The revised 2003 operating plan implemented a

---

[6]    Shortly thereafter, on February 21, 2003, the Federal
Defendants moved to transfer this case to the District Court for
the District of Nebraska, arguing that interest of justice strongly
favored transfer to that court.   On May 21, 2003, after
consideration of the arguments made by the multiple parties and
intervenors, the Court denied the Motion to Transfer, finding that
"[c]onsideration of both the private and public interests support
adjudication of the matter in the District of Columbia."  5/21/03
Slip Op. at 16.

[7]   In fact, the piping plover is threatened, not endangered.

[8]    In response to the issuance of these post-consultation
documents, on May 8, 2003, Plaintiffs filed an unopposed Motion for
Leave to File First Amended and Supplemental Complaint, which was
granted by the Court.

hybrid approach to management of the Missouri River Basin that would maintain relatively high flows throughout the summer to support downstream navigation by combining "steady-state" flow releases maintained at 26 to 27 Kcfs until midsummer, at which time the Corps plans to switch to flow-to-target operations with increasing flows to support navigation. Additional Supplemental Biological Assessment at 2-3, Ex. 16 to Pls.' Schneider Decl.  To date, the Corps has not issued this revised operating plan as a formal revision to the 2003 AOP.

FWS stated that a supplemental BiOp for the 2003 water year was needed due to "new information" that had become available since the 2000 BiOp had been completed, such as increases in tern and plover fledge ratios and habitat restoration efforts the Corps had implemented.  2003 Supplemental BiOp at 2-3, 6, Ex. 17 to Pls.' Schneider Decl.  The 2003 Supplemental BiOp issued by FWS analyzed the impact of the Corps' 2003 AOP on the three protected species and concluded that

> the revised proposed operation (i.e., 26-27 Kcfs [thousand cubic feet per second] flat release with subsequent flow-to-target) for the period from May 1 through August 15, 2003, in combination with all other aspects of the RPA from the [2000 BiOp], is a suitable replacement for the summer low flow component of the RPA for that time period only.

2003 Supplemental BiOp at 13.

Generally, FWS found that the Corps did not need to implement the flow changes recommended in the 2000 BiOp's RPA during the 2003 water year because the effect of take and harm that would result

-25-

from implementation of the 2003 AOP would not cause the three species irreversible harm. Accordingly, the 2003 Supplemental BiOp included an Incidental Take Statement that allowed take of eggs and chicks of 4-50 least terns and 11-71 piping plovers during the period at issue, 2003 Supplemental BiOp at 15 (variable take amounts dependant on exact flow rate), while explaining that there would be "[n]o take for pallid sturgeon beyond that described in the 2000 [BiOp]," id. at 14.

However, the 2003 Supplemental BiOp still identified the 2000 BiOp as "the controlling biological opinion." 2003 Supplemental BiOp at 13. The 2003 Supplemental BiOp acknowledged that if the Corps' operations in the Missouri River Basin were to continue to take the species at the level allowed in the 2003 Supplemental BiOp, it would increase the likelihood of "quasi-extinction" in the piping plover up to 68%, id. at 6, and anticipated that the Corps' implementation of the revised 2003 AOP would result in take of up to 7.5% of the least tern population, id. at 15. The 2003 Supplemental BiOp's treatment of the pallid sturgeon was quite sparse given that the "effects to pallid sturgeon during this short duration (May 1 - August 15), one-time operation are difficult to assess." Id. at 12. Thus, FWS' conclusions in the 2003 Supplemental BiOp were "specific to the 2003 operating year with the understanding that future operation will be consistent with the November 2000 biological opinion or an operational alternative

-26-

(i.e., new Master Manual) provided by the Corps that removes jeopardy." Id. at 10.

On May 23, 2003, Plaintiffs filed their Motion for Preliminary Injunction seeking to enjoin the Corps from implementing its revised 2003 AOP this summer and requiring the Corps to comply with the low summer flow requirements set out in the 2000 BiOp.

## III. Analysis

### A.   Procedural Arguments

#### 1.   **Plaintiffs' Claims Are Not Procedurally Barred under the ESA's 60-Day Notice Period.**

Defendant-Intervenor State of Nebraska argues that Plaintiffs are procedurally barred from seeking preliminary injunctive relief for failure to comply with the ESA's mandatory 60-day notice requirement with respect to the 2003 Supplemental BiOp and the Corps' subsequent revisions to the 2003 AOP. See 15 U.S.C. § 1640(g)(2)(A)(i).  It is undisputed that on November 7, 2002, Plaintiffs did comply with the ESA's mandatory 60-day notice by filing notice with the Corps and FWS of their proposed ESA challenge to the draft 2003 AOP's non-compliance with the 2000 BiOp.

As for Plaintiffs' additional ESA claims with regard to the 2003 Supplemental BiOp and revised 2003 AOP, the Court concludes that Plaintiffs' November 2002 filing put the Federal Defendants on adequate notice that Plaintiffs would seek, through litigation, to make them comply with ESA requirements in the management of the

-27-

Missouri River Basin during the 2003 water year. See Southwest
Center for Biological Diversity v. United States Forest Service,
307 F.3d 964, 975 (9th Cir. 2002) (where plaintiffs had given an
agency 60-day notice to sue for failure to perform ESA
consultation, that notice was sufficient to challenge the
consultation that took place after the notice was served because
the agency "would not have reasonably interpreted the initial
complaint at issue as one that simply sought consultation in and of
itself regardless of the validity of the consultation."); Water
Keeper Alliance v. United States Department of Defense, 271 F.3d
21, 30 (1st Cir. 2001) (the ESA's 60-day notice provision was
satisfied with regard to claims challenging some activity that
occurred after the notice had been sent because the original notice
made it sufficiently clear to the agency that the plaintiffs
"intended to challenge an ongoing delinquency in the preparation of
a biological assessment.").

     Accordingly, Plaintiffs are not procedurally barred from
seeking preliminary injunctive relief for failure to comply with
the ESA's mandatory 60-day notice requirement with respect to their
claims challenging the 2003 Supplemental BiOp and revisions to the
2003 AOP.

## 2.   The Court Need Not Rely on Plaintiff's Expert Declarations in Issuing This Decision.

In addition to their general opposition to Plaintiffs' Motion for Preliminary Injunction, both the Federal Defendants and the State of Nebraska have filed Motions to Strike the expert declarations that Plaintiffs submitted in support of their Motion for Preliminary Injunction.   The Federal Defendants and Nebraska argue that this extra-record evidence is impermissible under the APA's limitation on "the scope of judicial review...to the administrative record that was before the Secretary at the time that he or she made the decisions."  Fed. Defs.' Mot. at 5 (citing Environmental Defense Fund v. Costle, 657 F.2d 275, 285 (D.C. Cir. 1981).[9]

While it is true that "[a]s a general rule, plaintiffs may not supplant or supplement the administrative record," Fed. Defs.' Mot. at 6 (citing Peterson Farms I v. Madigan, 1992 WL 118370 (D. D.C. 1992)), this Circuit has recognized that courts may consider extra-record evidence in its review of agency actions under certain circumstances.   See Costle, 657 F.2d at 286. (recognizing "a judicial venture outside the record...[for] background information, or to determine the presence of the requisite fullness of the reasons given").  The D.C. Circuit has also recognized that federal

---

[9]    Ironically, while moving to strike Plaintiffs' expert declarations, the Federal Defendants filed an expert declaration in support of their own opposition brief, as did Defendant-Intervenor State of Missouri.

case law supports exceptions to the general rule prohibiting review
of extra-record evidence in instances

> (1) when agency action is not adequately explained in the
> record before the court; (2) when the agency failed to
> consider factors which are relevant to its final
> decision;...(5) in cases where evidence arising after the
> agency action shows whether the decision was correct or
> not;...and (8) in cases where relief is at issue,
> especially at the preliminary injunction stage.

Esch v. Yeutter, 876 F.2d 976, 991 & n. 166 (D.C. Cir. 1989)

(citing Stark & Wald, Setting No Records:  The Failed Attempts to

Limit the Record in Review of Administrative Action, 36

Admin.L.Rev. 333, 345 (1984)).  In fact, a number of District Court

decisions in this Circuit have acknowledged that the Esch decision

described the instances in which supplementation of the

administrative record is allowed.  See Pls.' Opp'n at 12, n.18.[10]

Thus, the Court concludes that this case fits squarely within
one of our Circuit's stated exceptions for allowing consideration
of extra-record declarations in administrative review cases--cases
involving preliminary injunctions.  See Esch, 876 F.2d at 991

---

[10]  Citing Carlton v. Babbitt, 26 F. Supp. 2d 102, 108 (D.D.C.
1998) for admission of an expert's declaration in an ESA case under
the Esch exceptions; Southwest Ctr. For Biological Diversity v.
Norton, Civ. Action No. 98-934 (RMU/JMF), 2002 WL 1733618, at *7
(D.D.C. July 29, 2002) for application of the fifth Esch exception
for "evidence arising after the agency action"; Nat'l Trust For
Historic Pres. v. Blanck, 938 F. Supp. 908, 916 (D.D.C. 1996) for
recognition of the Esch exceptions to the general rule, especially
with regard to preliminary injunctions; and LeBoeuf, Lamb, Greene
& MacRae, LLP v. Abraham, 215 F. Supp. 2d 73, 82 (D.D.C. 2002) and
Holy Land Found. For Relief & Dev. v. Ashcroft, 219 F. Supp. 2d 57,
66 n.9 (D.D.C. 2002) for recognition of the Esch exceptions to the
general rule.

(exception 7 for "cases where relief is at issue, especially at the preliminary injunction stage"). The Court also notes that if it adopted the narrow rule endorsed by the Federal Defendants and Nebraska barring consideration of all extra-record evidence, defendants could easily defeat requests for relief in almost all cases, especially those of a technical nature. in which a complete agency record had not been produced.[11]

Plaintiffs have presented numerous documentary exhibits in support of their motion, in addition to their expert declarations. The Federal Defendants do not object to consideration of these documents, which they concede will be part of the administrative record.[12]   Consequently, the Court finds that this documentary

_____

[11]   The Court finds that this same reasoning defeats the State of Nebraska's argument that any ruling on the Plaintiffs' APA claims is inappropriate given the absence of a complete administrative record.   While the Corps filed its Administrative Record with the Court on July 8, 2003, FWS is not expected to file its record until July 16, 2003, after the Corps plans to implement its summer flow changes.   If courts were strictly precluded from ruling on cases in which a complete administrative record was not available, the government could always block requests for preliminary injunctive relief by delaying production of the administrative record.   See Cascadia Wildlands Project v. United States Fish & Wildlife Service, 219 F.Supp.2d 1142, 1150 (D.Or. 2002) (granting a preliminary injunction until such time when "a full record will be available for review").

[12]   The State of Nebraska moves to strike all declarations submitted by Plaintiffs.   However, the Federal Defendants have not moved to strike the Schneider Declaration, which consists primarily of a list of the documentary exhibits attached to it.   As the Federal Defendants are best able to assess which documents will be included in the administrative record, the Court will rely upon the Schneider Declaration in reaching its decision.   In fact, the Administrative Record filed by the Corps on July 8, 2003, includes
(continued...)

-31-

evidence is sufficient to reach a decision at this time, and thus has no need to rely on Plaintiffs' contested expert declarations in doing so.[13]

### B.   Standard of Review for Preliminary Injunctions

Our Circuit generally applies a traditional four-part test to determine whether to grant a request for a preliminary injunction. Ashkenazi v. Attorney Gen. of the United States, 246 F. Supp. 2d 1, 3 (D.D.C. 2003) (citing Weinberger v. Romero-Barcelo, 456 U.S. 305, 312-12 (1982); National Wildlife Federation v. Burford, 835 F.2d 305 (D.C. Cir. 1987)).   To obtain preliminary injunctive relief under this traditional test, a plaintiff has the burden of demonstrating:   "1) a substantial likelihood of success on the merits, 2) that [plaintiff] would suffer irreparable injury if the injunction is not granted, 3) that any injunction would not substantially injure other interested parties, and 4) that the public interest would be served by the injunction."   Katz v. Georgetown University, 246 F.3d 685, 687-88 (D.C. Cir. 2001); Ashkenazi, 246 F. Supp. 2d at 3.

---

[12] (...continued)
most, if not all, of those exhibits.  See Fed. Defs.' Notice of Filing of Administrative Record ("Corps A.R."), Ex. 1, 2 (index of documents contained in the administrative record).

[13]    The Court notes that it has appropriately relied upon some documentary exhibits attached to the expert declarations in order to obtain a thorough background of the case.  See Costle, 657 F.2d at 286.  In fact, the Corps' Administrative Record includes one such exhibit referenced by the Court.  See, e.g., NAS Report, Ex. 2 to Pls.' Keenlyne Decl. and Corps A.R., Doc. 1521.

However, Plaintiffs argue that in injunction actions involving application of the ESA, a different test must be applied. See, e.g., National Wildlife Federation v. Burlington N.R.R., 23 F.3d 1508, 1510-11 (9th Cir. 1994) ("traditional test for preliminary injunctions...is not the test for injunctions under the Endangered Species Act"). Plaintiffs argue that in upholding the ESA's central goal of protecting endangered or threatened species, courts have held that a preliminary injunction can be granted under the ESA when the moving party "1) has had or can likely show 'success on the merits,' and 2) makes the requisite showing of 'irreparable injury.'" Southwest Center for Biological Diversity v. United States Forest Service, 307 F.3d 964, 972 (9th Cir. 2002) (internal quotations and citations omitted). See also Defenders of Wildlife v. EPA, 688 F. Supp. 1334, 1355 (D. Minn. 1988) ("traditional balancing of equities [for issuance of an injunction under the ESA] is abandoned in favor of an almost absolute presumption in favor of the endangered species") (emphasis added), aff'd in part, rev'd in part on other grounds, 882 F.2d 1294 (8th Cir. 1989); Strahan v. Coxe, 127 F.3d 155, 160 (1st Cir. 1997) (applying a two-part preliminary injunction standard to ESA cases because "the balancing and public interest prongs have been answered by Congress' determination that the balance of hardships and the public interest tips heavily in favor of protected species")(internal citations and quotations omitted); but see Water Keeper Alliance, 271 F.3d at 34

-33-

(applying a four-part standard under the ESA because of the case's "national security").

Application of a two-part test for ESA claims flows from the Supreme Court's conclusion that Congress spoke in the "plainest of words" in enacting the ESA, "making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." TVA, 437 U.S. at 194. Thus, courts have ruled that they could not "use equity's scales to strike a different balance." Sierra Club v. Marsh, 816 F.2d 1376, 1383 (9th Cir. 1987); see also Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982) (in comparing the ESA with the Clean Water Act, the Court stated that its TVA decision was based on an understanding that under the ESA, Congress had "foreclosed the exercise of the usual discretion possessed by a court of equity"); Burlington N.R.R., 23 F.3d at 1511 (in ESA cases, "Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests"); Greenpeace v. NMFS, 106 F. Supp. 2d 1066, 1072 (W.D. Wash. 2002) (applying a two-part test because "the balance of the hardships has already been struck in favor of endangered species").

Defendants argue that the District Court judges in this Circuit have "continued to apply [the] four-part balancing test in ESA cases." Fed. Defs. Opp'n at 17 (citing Fund For Animals v. Turner, 1991 WL 206232 at *1 (D.D.C. 1991); North Slope Borough v.

-34-

Andrus, 486 F. Supp. 325, 329-332 (D.D.C. 1979) (both applying the traditional four-part balancing test in an ESA case)).

While this Court concludes that Congress has spoken clearly in the ESA and "that the balance has been struck in favor of affording endangered species the highest of priorities," TVA, 437 U.S. at 194, it is also true that our Circuit has not definitively ruled on the issue. Consequently, out of an abundance of caution, this Court will choose the most conservative alternative and apply the four-part test.

## C. Plaintiffs Are Likely to Succeed on the Merits of Their APA and ESA Claims.

Plaintiffs' Motion for Preliminary Injunction argues that they are likely to succeed on the merits of their claims that the FWS' 2003 Supplemental BiOp violates the APA and the ESA, and that under the controlling 2000 BiOp, the Corps' 2003 management of the Missouri River Basin pursuant to the 2003 AOP (by virtue of regulating the flow of the River) violates the ESA and the APA. Essentially, Plaintiffs argue that the 2003 Supplemental BiOp is arbitrary and capricious under the APA because it is poorly reasoned and fails to adequately explain FWS's decision to depart from the adaptive management RPA contained in the 2000 BiOp.

Plaintiffs also argue that the Corps' 2003 AOP violates the ESA because it fails to avoid jeopardy to the species and results in a take of the three species not allowed by the Incidental Take Statement contained in the controlling 2000 BiOp. That Statement

-35-

required the Corps to implement all aspects of the RPA, including summer low flow in order to avoid violating Section 9 of the ESA.

Defendants argue that Plaintiffs are unlikely to succeed on the merits of their claims because the 2003 Supplemental BiOp is a well-reasoned, logical addition to the 2000 BiOp, and thus is not arbitrary and capricious. Accordingly, Defendants argue that the Incidental Take Statement contained in the 2003 Supplemental BiOp protects the Corps from any ESA Section 9 violations that might occur from implementation of the non-low flow regime this summer as outlined in the 2003 AOP. Defendants also assert that the recent FCA decision by the Eighth Circuit and the underlying injunction from the Nebraska District Court binds the Corps to operate the Missouri River Basin to support navigation downstream, and thus bars implementation of the low flow summer regime that Plaintiffs seek to impose.

Plaintiffs have presented a number of arguments in support of their claims that the 2003 Supplemental BiOp and the revised 2003 AOP violate the ESA and APA. In light of the high level of deference given to agency decisions, the Court will examine Plaintiffs' strongest arguments below. Plaintiffs need only establish a likelihood of succeeding on the merits of any one of those claims in order to satisfy this part of the preliminary injunction standard for obtaining the injunctive relief they seek. See National Wildlife Federation v. Burford, 835 F.2d 305, 319 (D.C. Cir. 1987) (affirming district court's decision not to reach

-36-

the merits of all plaintiff's claims after concluding that
plaintiff was likely to succeed on the merits of two claims that
would entitle it to permanent injunctive relief).

### 1. Judicial Review of ESA and APA Claims

Plaintiffs' Motion for Preliminary Injunction asserts claims
brought under the ESA's citizen suit provision, 16 U.S.C. §
1540(g), and under the APA, 5 U.S.C. § 706(2)(A). Under the ESA,
agency decisions are reviewed under the standards set forth in the
APA. Carlton v. Babbitt, 26 F. Supp.2d 102, 106 (D.D.C. 1998)
(citing Las Vegas v. Lucan, 891 F.2d 927, 932 (D.C. Cir. 1989).
Thus, in reviewing the actions of FWS and the Corps in this case,
an agency's action may be set aside only if it is "arbitrary,
capricious, an abuse of discretion, or otherwise not in accordance
with law" or "without observance of procedure required by law." 5
U.S.C. § 706(2)(A).

In making the arbitrary and capricious determination, the
court may not substitute its judgment for that of the agency.
Citizens to Preserve Overtone Park, Inc. v. Vole, 401 U.S. 402, 416
(1971). Accordingly, the court does not undertake its own fact-
finding, but reviews the administrative record assembled by the
agency to determine whether its decision was supported by a
rational basis. See Camp v. Pints, 411 U.S. 138, 142 (1973). The
court's limited role is to ensure that the agency's decision is
based on relevant factors and not a "clear error of judgment." Id.

-37-

If the "agency's reasons and policy choices...conform to 'certain minimal standards of rationality'...the rule is reasonable and must be upheld." Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 521 (D.C. Cir. 1983) (citation omitted).

In exercising its narrowly defined review authority under the APA, a court must consider whether the agency acted within the scope of its legal authority, whether the agency adequately explained its decision, whether the agency based its decision on facts in the record, and whether the agency considered the relevant factors. Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989); Citizens to Preserve Overtone Park, 401 U.S. at 415; Professional Drivers Council v. Bureau of Motor Carrier Safety, 706 F.2d 1216, 1220 (D.C. Cir. 1983).

The deference a court must accord an agency's decision-making is not unlimited, however.  For example, the presumption of agency expertise may be rebutted if its decisions are not reasoned. ALLTEL Corp. v. FCC, 838 F.2d 551, 562 (D.C. Cir. 1988).  Where an agency fails to articulate "a rational connection between the facts found and the choice made," Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, et al., 462 U.S. 87, 88 (1983), the Court "'may not supply a reasoned basis for the agency's action that the agency itself has not given.'" Dithiocarbamate Task Force v. EPA, 98 F.3d 1394, 1401 (D.C. Cir. 1996) (quoting Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,

463 U.S. 29, 43 (1983)). If an agency fails to articulate a rational basis for its decision, it is appropriate for a court to remand for reasoned decision-making. See, e.g., Carlton v. Babbitt, 900 F.Supp. 526, 533 (D.D.C. 1995) (remanding FWS's 12-month finding that the grizzly bear should not be reclassified because the FWS "failed to sufficiently explain how it exercised its discretion with respect to certain of the statutory listing factors").

### 2.   Under the FCA, the Corps Has the Discretion, and Thus the Obligation, To Manage the Missouri River in Compliance with the ESA.

Under the ESA, government agencies are obligated to protect endangered and threatened species to the extent that their governing statutes provide them the discretion to do so. See Platte River Whooping Crane Critical Habitat Maintenance Trust v. Federal Energy Regulatory Comm'n, 962 F.2d 27, 34 (D.C. Cir. 1992) (The ESA "directs agencies to 'utilize their authorities' to carry out the ESA's objectives; it does not expand the powers conferred on an agency by its enabling act.")(emphasis in original)(internal citation and quotations omitted); American Forest & Paper Ass'n v. EPA, 137 F.3d 291, 299 (5th Cir. 1998): (The ESA "serves not as a font of new authority, but as something far more modest:   a directive to agencies to channel their existing authority in a particular direction.").

-39-

In assessing statutory authority and discretion with regard to ESA obligations, courts have found that if an agency has any statutory discretion over the action in question, that agency has the authority, and thus the responsibility, to comply with the ESA. See Klamath Water Users Protective Assen v. Patterson, 204 F.3d 1206, 1213 (9th Cir. 2000) (affirming that water contractors' right to water "[was] subservient to the ESA" because the Bureau of Reclamation had the "authority to direct Dam operations to comply with the ESA" given its retention of Dam management and ownership under those water contracts); Rio Grande Silvery Minnow v. Keys, No. 02-2254, 2003 WL 21357246, *14 (10th Cir. June 12, 2003) (Bureau of Reclamation had "to fulfill its obligations under the ESA" given its "discretion under [water] contracts to determine the 'available water' to allocate.").

Under the FCA, Congress provided that the Secretary of the Army "shall...prescribe for the use of storage water allocated for flood control or navigation at all reservoirs constructed [under this Act]...and the operation of any such project shall be in accordance with such regulations." 33 U.S.C. § 709. Thus, it is clear that the FCA does not deprive the Corps of all discretion in its management of the Missouri River Basin. In fact, the Eighth Circuit acknowledged that

> [t]he Flood Control Act clearly gives a good deal of discretion to the Corps in the management of the River. But this discretion is not unconstrained; the Act lays out purposes that the Corps is to consider in managing

the River....   While flood control and navigation are
dominant functions, the Act also recognizes recreation
and other interests and secondary uses that should be
provided for.   Flood Control Act Section 4, 58 Stat. at
889-90.   The text of the Flood Control Act thus sets up
a balance between flood control, navigation, recreation,
and other interests...[and the] Flood Control Act calls
on the Corps to balance these various interests.

Ubbelohde, 330 F.3d at 1027 (emphasis added).  The FCA provides the

Corps the discretion to consider its ESA obligations as one of the

"other interests" to be balanced when making river management

decisions under the FCA.  Moreover, such ESA compliance can come at

the expense of other interests, including navigation and flood

control given the Supreme Court's conclusion that the ESA

"reveal[ed] a conscious decision by Congress to give endangered

species priority over the 'primary missions' of federal agencies."

TVA, 437 U.S. at 185 (emphasis added).

     For more than a decade, the Corps and FWS have been in

consultation over revision of the Master Manual and operation of

the Missouri River Basin to achieve compatibility with the ESA.

See 1990 BiOp at 3 (FWS "received a request from the Corps...to

initiate formal consultation on [Missouri River Basin]

operations."); 2000 BiOp, Executive Summary at 1 (The Corps "asked

[FWS] to formally consult under the [ESA] on the Operations of the

Missouri River Main Stem System."); Corps A.R., Doc. 1614 (Dec. 20,

2002 letter from the Corps to FWS requesting "to initiate formal

consultation on the 2003 [AOP]").  In fact, the Corps stated that

it had entered into consultation with FWS "under Section 7 of the

-41-

ESA to determine...[measures that would] ultimately achieve conditions that are necessary to satisfy [ESA] requirements" and noted that it looked forward to "further consultation" with FWS. Ex. 10 to Pls.' Schneider Decl. at 2 (Sept. 27, 2002 letter from the Corps to FWS). It is hard to believe that the Corps would have participated in this lengthy consultation unless it recognized and accepted its obligations to conform Master Manual revision and its management of the Missouri River Basin to the ESA.

Defendants rely on the Eighth Circuit's recent holding in South Dakota v. Ubbelohde to argue that the Corps does not have the statutory discretion to manage the Missouri River Basin in compliance with the ESA because the Master Manual, with its priority to maintain navigation, "is binding on the Corps." Ubbelohde, 330 F.3d at 1033. While the Eighth Circuit did find that the Master Manual was binding on the Corps, the Master Manual itself affords the Corps discretion in management of the Missouri River.[14] The Master Manual allows the Corps to consider a variety of factors when setting the annual navigation season, such as preferable season length and drought conditions. Master Manual at IX-6-7, pt. 9-15; IX-9, pt.9-18.

---

[14] In fact, FWS long ago determined that the ESA applied to activities performed and decisions made pursuant to the Master Manual. See Ex. 28 to Pls.' Schneider Decl. at 2 (Oct. 19, 1992 letter from Interior Department Regional Solicitor to FWS Regional Director).

Accordingly, the Court concludes that the FCA, as well as the Master Manual, afford the Corps sufficient discretion in its management of the Missouri River Basin to require the Corps to fulfill its responsibilities under the ESA.[15]

### 3. Plaintiffs Are Likely to Succeed on Their Claims That the 2003 Supplemental BiOp Violates the ESA and APA.

#### a. The 2003 Supplemental BiOp's No Jeopardy Finding Is Premised on a Condition That Is Virtually Certain Not to Occur.

The cornerstone of the 2003 Supplement BiOp's no jeopardy finding for the least tern, piping plover, and pallid sturgeon is the assumption that the Corps will be in full compliance with ESA-required flow changes in the future. The 2003 Supplemental BiOp explicitly states that its findings were

> specific to the 2003 operating year with the understanding that future operation will be consistent with the November 2000 biological opinion or an operational alternative (i.e., new Master Manual) provided by the Corps that removes jeopardy.

2003 Supplemental BiOp at 10 (emphasis added).

A no jeopardy finding under the ESA must have a reasonable certainty of occurring, not just a reasonable chance. National Wildlife Federation v. NMFS, 254 F.Supp. 1196, 1213 (D. Ore. 2003)

---

[15] The Court also notes that it is unlikely that the State of Nebraska will be successful in its crossclaim against the Federal Defendants, alleging that the entire ESA consultation process for the Missouri River Basin is illegal given the Corps' alleged overall lack of discretion under the ESA. See, generally, State of Nebraska's Crossclaim (filed 4/10/03).

(finding a BiOp arbitrary and capricious because its no jeopardy finding relied on non-federal mitigation actions which were not guaranteed to occur). In <u>National Wildlife Federation</u>, the court found that a majority of NMFS' no jeopardy finding was premised on acts that were "not reasonably certain to occur." <u>Id.</u>, 254 F.Supp. at 1214. In this case, FWS' reliance on purely speculative actions by the Corps is even more clear cut. While it is true that the 2003 Supplemental BiOp presented a number of factors that contributed its no jeopardy finding, it is clear that its overall conclusion that the revised 2003 AOP would not cause jeopardy was based on the presumption that the Corps would implement the appropriate water management changes in the future.

Here the Corps has made it perfectly clear that it has <u>no</u> intention of ensuring that its future operations will be "consistent with the [2000 BiOp] or an operational alternative (i.e., new Master Manual) provided by the Corps that removes jeopardy." 2003 Supplemental BiOp at 10. At the very lengthy Motions Hearing, the attorney for the Federal Defendants was repeatedly questioned about the assurances or commitments that the Corps were prepared to give regarding future compliance with the 2000 BiOp and the attorney admitted that no such assurances had been, or would be, given. <u>See</u> Tr. 95:9 - 98:12.[16]

---

[16] During the Motions Hearing, the following colloquy took place between the Court and the Federal Defendants' attorney:
(continued...)

-44-

[16](...continued)
THE COURT:   What kinds of commitments is the Corps
offering so as to give any credibility to its promise
that it will not take a similar position in 2004, and
that it will, indeed, comply with the biological opinion
of 2000?

MR. MAYSONETT:  Well, I think the Corps'...[is] working
through revisions to the Master Manual, and they are
engaged in consultation with the Fish and Wildlife
Service for the Master Manual.... [T]o the extent that
the Corps doesn't operate under the RPA set out in the
2000 biological opinion in the future, it has to go to
the...Service again to initiate consultation....  So to
the extent that the Corps doesn't implement the RPA or a
suitable alternative..., the Corps and the Service will
be in consultation again next year.....  There is nothing
in the 2003 biological opinion that indicates that the
Service -- in fact there are statements to the contrary
that show that the Service is not simply going to agree
that this level of take every year is -- will ensure that
these species are not likely to be jeopardized.

THE COURT:  Well, I guess I certainly got an answer by
silence to my question, which was, what commitments and
assurances is the Corps prepared to offer to establish
that next year it will comply with the 2000 biological
opinion, and your answer, in effect, was none.  Isn't
that right?

MR. MAYSONETT:  Well, I'm not certain what assurances the
Corps could offer.

THE COURT:   Isn't that the precondition of the 2003
biological opinion, that the Corps will, next year,
comply with the 2000 biological opinion?

MR. MAYSONETT:  ...[T]o the extent that the Corps does
something else that doesn't fall within the scope of the
[2000] biological opinion, it will have to reengage in
consultations with the Service.

THE COURT:  The 2003 biological opinion says there will
be no jeopardy if, as of next year, the 2000 biological
opinion is followed, does it not say that?

(continued...)

-45-

In addition, it is virtually certain no revised version of the Master Manual will be completed in time to be used in the 2004 water year, since both the Corps and FWS have stated that they intend to reinitiate or continue consultation on Missouri River Basin operations.  See 2003 Supplemental BiOp at 4 ("The Corps and [FWS] may reinitiate section 7 formal consultation on Missouri River operations."); 7/2/03 Motions Hearing Transcript ("Tr.") at 95:15-17 (The Corps is "engaged in consultation with the Fish and Wildlife Service for the Master Manual.")

Under the ESA, FWS had the obligation to determine that there was a reasonable certainty that the revised 2003 AOP would not cause jeopardy to the least tern, piping plover, and pallid sturgeon, and under the APA, they had to give a reasonable explanation for that determination.  Given that there is not even

---

[16](...continued)
MR. MAYSONETT:  It does.

THE COURT:  Therefore, the precondition it seems to me, or maybe you want to call it the fundamental assumption of the 2003 biological opinion, is that there will be compliance next year with the 2000 biological opinion, and what I hear you telling me is that the Corps is certainly not prepared to give any assurances whatsoever that next year we won't be back in my courtroom with the same request for a preliminary injunction, because it is not going to follow the 2000 biological opinion.  Isn't that right?  That you cannot or you are not making those assurances now?

MR. MAYSONETT:  Well, I am not making those assurances now....

Tr. 95:9 - 98:12.

-46-

a reasonable certainty that the Corps will comply with the 2000 BiOp or prepare a revised Master Manual in the coming year, the Court concludes that Plaintiffs will be likely to prove that the 2003 Supplemental BiOp violated the ESA and APA by improperly and unreasonably relying on future actions by the Corps that are virtually certain <u>not</u> to occur.

### b.  The 2003 Supplemental BiOp Is an Improper Segmentation of ESA Consultation.

Under the ESA, FWS is required to consider the Corps' proposed action in the context of its overall management of the Missouri River Basin.  Instead, FWS considered the effects of the revised 2003 AOP only in the context of one isolated year--FY 2003. Significantly, FWS' own regulations prohibit this very type of segmentation while consulting on agency action.  FWS regulations require that its ESA consultations evaluate "the effects of other activities that are interrelated or interdependent" with the action under consideration, including "those that are part of a larger action and depend on the larger action for their justification." 50 C.F.R. § 402.02 (definition of "effects of the action").  By narrowly focusing its analysis on the impacts of 2003 high summer flows on the least tern, the piping plover, and the pallid sturgeon in this year only, instead of evaluating both the present and future effects of the 2003 low summer flows on these species, the 2003 Supplemental BiOp ignores this requirement.

-47-

Nor can there be any question that the ESA requires that all impacts of agency action--both present and future effects on species--be addressed in the consultation's jeopardy analysis. See Conner v. Burford, 848 F.2d 1441, 1457-58 (9th Cir. 1988), cert. denied, 489 U.S. 1012 (1989)(the ESA "does not permit the incremental-step approach" of consultation because "biological opinions must be coextensive with the agency action").

Moreover, there are significant reasons to reject the segmentation FWS has utilized in this case. If FWS were allowed to apply such a limited scope of consultation to all agency activities, any course of agency action could ultimately be divided into multiple small actions, none of which, in and of themselves, would cause jeopardy. Moreover, such impermissible segmentation would allow agencies to engage in a series of limited consultations without ever undertaking a comprehensive assessment of the impacts of their overall activity on protected species. The ESA requires more; it "requires that the consulting agency scrutinize the total scope of agency action." North Slope Borough v. Andrus, 486 F. Supp. 332, 353 (D.D.C. 1980), aff'd in part, rev'd in part on other grounds, 642 F.2d 589 (D.C. Cir. 1980) (emphasis added).

Because the 2003 Supplemental BiOp confines itself to considering only the effects of the Corps' actions during this summer, the Court concludes that Plaintiffs have demonstrated a substantial likelihood of succeeding on its claim that FWS

-48-

improperly segmented its consultation duties in violation of the ESA.

> ### c. The 2003 Supplemental BiOp Fails to Adequately and Reasonably Explain Its Departure from the 2000 BiOp's Conclusion that Flow Changes Were Required by 2003 in Order to Avoid Jeopardy to the Least Tern, Piping Plover and Pallid Sturgeon.

Plaintiffs argue that the Court should apply heightened scrutiny to the FWS' 2003 Supplemental BiOp, because APA review is "heightened somewhat" when an agency's action reverses its prior position. NAACP v. FCC, 682 F.2d 993, 998 (D.C. Cir. 1982) (affirming reversal of a previous agency policy based on extensive data regarding the changing circumstances that supported its reversal of position). In response, the Federal Defendants argue that the 2003 Supplemental BiOp does not represent a reversal of agency position, but rather an "amendment" which is consistent with the 2000 BiOp's analysis of the Corps' overall management plan for the Missouri River Basin.

The Court finds that FWS has failed to articulate any reasonable explanation for its departure from--not to say abandonment of--the analysis contained in the 2000 BiOp. See NAACP, 682 F.2d 993, 998 (agency decision is only rational if the agency has "articulated permissible reasons for that change").

It is undisputed that the parties still consider the 2000 BiOp to be "the controlling biological opinion," 2003 Supplemental BiOp

-49-

at 13.    The 2000 BiOp clearly stated that the Corps needed to implement low summer flow, along with all other portions of the RPA, no later than 2003 in order to protect the three species from jeopardy.    2000 BiOp at 243.    FWS then turned full circle and concluded in the 2003 Supplemental BiOp "that the revised [2003 AOP]...,in combination with all other aspects of the RPA from the [2000 BiOp], is a suitable replacement for the summer low flow component of the RPA" to protect against jeopardy to the species. 2003 Supplemental BiOp at 13.

     When faced with a similar reversal of the importance of timely compliance with a BiOp's RPA, the court in Southwest Center for Biological Diversity v. Babbitt found that the agency had acted arbitrarily and capriciously.  Id., Nos. Civ. 97-0474 PHX-DAE, 97-1479 PHX-DAE, 2000 WL 33907602 (D. Ariz. Sept. 26, 2000).  In that case, FWS had issued a BiOp with specific deadlines for implementation of RPAs but then issued amendments to the BiOp which abandoned those time requirements.  The court determined that the amendments were arbitrary and capricious because "the previous BiOp establishe[d] that time [was] of the essence in implementing the RPA" but the amendments fail[ed] to provide a scientific basis" for changing those timelines.  Id., 2000 WL 33907602 at *11.  In this case, it is equally clear that FWS "is attempting to say that the deadlines [for summer low flow] are not essential when it has already been established [for three years] that they are."  Id.

FWS cites improvements in fledge ratios for the least tern and piping plover over the last few years to justify its 2003 no jeopardy finding.   However, the agency fails to explain why improvement in what was only one of many factors relied upon in the 2000 BiOp, now justifies total abandonment of the need for low flow targeted as absolutely necessary in the 2000 BiOp.   In addition, while FWS found that allowing one season of take in this year will not lead the species to extinction, the 2003 Supplemental BiOp fails to even address how this one year of take will affect not just harm, but ultimate recovery of the three species which are in peril.   See 50 C.F.R. §402.02 (FWS defines jeopardy as actions which would "reduce appreciably the likelihood of both the survival and recovery of a listed species....")(emphasis added); see also NRDC v. Evans, 232 F. Supp. 2d 1003, 1047-48 (N.D. Cal. 2002) (finding that plaintiffs were likely to prevail in showing that NMFS acted arbitrarily and capriciously by failing to examine whether the challenged action was "likely to adversely affect the recovery of these species, even if it would not affect their survival").

Finally, FWS has failed to explain why improvements in the condition of the least tern and piping plover[17] over the past three years warrants such a dramatic departure from the conclusions of

---

[17]   No improvement has been observed in the plight of the pallid sturgeon.

the 2000 BiOp's requiring low summer flow. These conclusions were based on literally decades of data and supported by multiple scientific panels. See § IB2b, supra (discussing NAS and FWS/Corps-peer review of the 2000 BiOp). In fact, not only has the 2003 Supplemental BiOp not undergone similar peer review, the Federal Defendants did not even allow public comment on it. See Tr. at 32:2-4 ("Unlike the 2000 biological opinion, there was no public comment, no scientific input, no peer review...for the 2003 biological opinion.").

In addition, the state wildlife officials who did submit comments argued that there was no "new biological information that would alter the conclusions and recommendations of the [2000 BiOp]" and concluded that the information that had been collected since the completion of the 2000 BiOp, from the "the [RDEIS], the [NAS] report...., tern and plover river fledgling success in 2002, plover populations modeling..., and [other] analyses...all point to the need to implement and test alternatives to current [Missouri River Basin] operations.". Ex. 21 to Pls.' Schneider Decl. at 1 (April 8, 2003 letter to J.K. Towner of FWS from S. Adams of the Missouri River Natural Resources Committee ("MRNRC"), a collection of relevant wildlife agencies from both Upper and Lower Basin states on the Missouri River[18]); see also Ex. 20, 23-27 (letters from each

---

[18] MRNRC members include: Montana Dept. of Fish, Wildlife, and Parks; North Dakota Game and Fish Dept.; South Dakota Dept. of (continued...)

of the individual agencies of the MRNRC, restating that committee's position).

Consequently, the Court concludes that Plaintiffs are likely to prove that the 2003 Supplemental BiOp is arbitrary and capricious given FWS' failure to "satisfactorily explain" why it has abandoned the 2000 BiOp's extensively peer-reviewed and approved requirement for implementing summer low flow no later than 2003. See National Audubon Society v. Hester, 801 F.2d 405, 408 (D.C. Cir. 1986) (holding that any alteration to agency action can be held arbitrary and capricious if the agency does not "satisfactorily explain" its reason for the alteration).

### d. Plaintiffs Are Likely to Establish that the 2003 AOP Violates the ESA.

Having found it likely that Plaintiffs will be able to prove that the 2003 Supplemental BiOp violated both the ESA and APA, the Court must now evaluate the revised 2003 AOP under the controlling ESA document--the 2000 BiOp.  It is undisputed that the Corps' revised 2003 AOP does not implement low summer flows, and it is also undisputed that the 2003 AOP's flow mandates will result in significant takes of both piping plovers and least terns. See 2003 Supplemental BiOp at 10 ("Depending on conditions in 2003, losses for terns and plovers (eggs and chicks) are predicted to be between

---

[18](...continued)
Game, Fish, and Parks; Nebraska Game and Parks Comm.; Iowa Dept. of Natural Resources; Kansas Dept. of Wildlife and Parks; and Missouri Dept. of Conservation.

15 and 121 individuals/birds."). Thus, it is clear that under the
terms of the 2000 BiOp's Incidental Take Statement, which required
implementation of the RPA's summer low flow, the Corps' take of
these species will be illegal.

While Defendants may try to argue that no section 9 violation
can be found when a take has not yet occurred, a violation of
Section 9 is actionable once a "take" is shown to be "imminent."
Marbled Murrelet v. Pacific Lumber Co., 83 F.3d 1060, 1066 (9th
Cir. 1966); see also Defenders of Wildlife v. Bernal, 204 F.3d 920,
925 (9th Cir. 2000) (injunction may issue under section 9 of the
ESA when there is a "reasonably certain threat of imminent harm to
a protected species"). Given that FWS stated that water releases
under the revised 2003 AOP would lead to "inundation after nest
initiation" with a predicted loss of up to 121 terns and plovers,
2003 Supplemental BiOp at 10, the Court finds that the Corps' take
of terns and plover is imminent and thus actionable.

Moreover, the undisputed nature of the harm to the three
protected species, as well as the degradation of their habitat,
that will occur from the Corps' management of river flow under the
revised 2003 AOP also demonstrates that the Corps is likely to
violate its affirmative obligation under ESA Section 7 to "insure"
that its actions will not harm the species. Pyramid Lake Paiute
Tribe of Indians v. United States Dept. of Navy, 898 F.2d 1410,
1415 (9th Cir. 1990) ("[W]hile consultation...may have satisfied

-54-

the Navy's procedural obligations under the ESA, the Navy may not rely solely on a FWS biological opinion to establish conclusively its compliance with its substantive obligations under section 7(a)(2)."); see also Resources Ltd., Inc., v. Robertson, 35 F.3d 1300, 1304-05 (9th Cir. 1993) (finding that an agency "acted arbitrarily and capriciously in concluding, on the record as a whole, that [its] Plan would not jeopardize listed species" when its own studies raised "serious questions" about the effects of its plan on a threatened species).

Accordingly, the Court concludes that Plaintiffs are likely to succeed in establishing that the Corps' revised 2003 AOP violates both sections 7 and 9 of the ESA because it fails to insure that ESA-listed species will not be harmed and, in fact, results in take of both endangered and threatened species.

## D.   Failure to Grant an Injunction Will Cause Irreparable Harm to These Three Species

As demonstrated, the Corps' current management plan will result in a direct take of two of the species in excess of that permitted under the 2000 BiOp and harm to the habitats of all three protected species.   Plaintiffs argue that the three listed species will be irreparably harmed if an injunction is not issued to stop the Corps' illegal take.   As already noted above, implementation of the revised 2003 AOP would result in significant take of both piping plovers and least terns.   See 2003 Supplemental BiOp at 10 ("Depending on conditions in 2003, losses for terns and plovers

-55-

(eggs and chicks) are predicted to be between 15 and 121 individuals/birds."). Regarding harm to the pallid sturgeon under the revised 2003 AOP, FWS admitted effects to pallid sturgeon were "difficult to assess." Id. at 12.

Defendants contend that Plaintiffs cannot show irreparable harm to the species to the extent required under the ESA because the 2003 Supplemental BiOp determined that any take was not likely to cause jeopardy to or cause extinction of the least tern, piping plover, or pallid sturgeon. Since the Court has already concluded that Plaintiffs are likely to prove that the 2003 Supplemental BiOp is arbitrary and capricious, and therefore without legal effect, Defendants cannot rely on that BiOp to argue that there is no irreparable harm. Instead, the Court relies on the findings in the 2000 BiOp--the BiOp that all parties deem to be controlling--which clearly states that the Corps' continued implementation of navigation-focused management of the Missouri River is "likely to jeopardize the continued existence" of these species and that flow changes are necessary in order to "eliminate jeopardy." 2000 BiOp, Executive Summary at 1-2.

In considering whether a proposed agency action will cause irreparable harm to threatened or endangered species, another member of this District Court has concluded that even when there was "not the remotest possibility that [the planned agency activity] during the period in which a preliminary injunction would

-56-

be in place [would] eradicate the species," the strong congressional mandate contained in the ESA to protect endangered and threatened species supported the finding that "the loss even of the relatively few [individuals] that are likely to be taken through [an agency action] during the time it will take to reach a final decision in this case is a significant, and undoubtedly irreparable, harm." Fund for Animals, 1991 WL 206232 at *8 (enjoining a hunting season which would have killed an estimated three threatened grizzly bears).

Presently, the piping plover population on the Missouri River consists of about 2,000 birds, and there are approximately 7,000 birds in the tern population. Tr. 94:16,19. The implementation of high summer flows under the revised 2003 AOP will result in a direct take of these birds through flooding of nests. 2003 Supplemental BiOp at 10. While it is undisputed that high flow this summer will not lead to extinction of the species this year, the 2000 BiOp made clear that long term recovery of the species is dependant, in large part, on the long-planned implementation of low summer flow in 2003.[19] Thus, the Court finds

---

[19]    The 2003 Supplemental BiOp relies heavily on recent increases in tern and plover fledgling rates to support its no jeopardy finding. While all parties debate the scientific propriety of this reliance given that unusual drought conditions have increased tern and plover habitat, it is undisputed that the 2000 BiOp considered fledgling rates to be only one of many factors for be considered in species longevity and recovery. See 2000 BiOp at 270 (Attainment of certain fledge ratios "is not likely to
(continued...)

that implementation of the revised 2003 AOP will result in irreparable injury to the recovery and continued existence of these birds.

The plight of the pallid sturgeon is even more dire. It is estimated that fewer than 2000 wild pallid sturgeon remain alive in the United States, and they live primarily in the Missouri River. 2000 BiOp at 105. The pallid sturgeon is on the brink of extinction. When listing the species as endangered, FWS specifically stated that "damming, channelization, altered and/or degraded water quality, and altered flow regimes" were detrimental to the fish and that these threats to the species' viability were "not likely to be modified to avoid jeopardy...without protection under the Act." 55 Fed. Reg. 36646. The 2003 Supplemental BiOp found that because there is no evidence that pallid sturgeon are reproducing in the wild, implementation of the revised 2003 AOP was unlikely to cause direct harm to this endangered species. 2003 Supplemental BiOp at 12. However, the 2000 BiOp found, in contrast, that summer low flow was required to insure the overall existence and recovery of this species by providing for both the future stock of forage fish upon which juvenile pallid sturgeon will feed and the general health of the sturgeon habitat. 2000 BiOp 241-43. Given the extremely weakened state of the pallid

---

[19](...continued)
result in jeopardy...when the reasonable and prudent alternative is implemented.")

sturgeon population on the Missouri River, the Court finds that any potential harm from delaying implementation of summer low flow is irreparable and must be avoided.

Under the ESA, agencies are required to insure that their actions harm neither the existence nor recovery of endangered and threatened species. Implementing high summer flows in 2003 will cause direct take of the least tern and piping plover and direct harm to the habitat and food source of the pallid sturgeon. Implementing high summer flow in 2003 is also highly likely to produce negative long-term effects on the existence and recovery of these endangered and threatened species. Consequently, the Court concludes that implementation of the revised 2003 AOP will cause irreparable harm this summer that can only be avoided through issuance of a preliminary injunction. Cf. North Slope Borough, 486 F. Supp. at 331 (finding no irreparable harm because the challenged agency activities were not scheduled to begin until the next year, allowing the court to make a full determination on the merits before any harms could occur).

**E.   Harm to the Species in Denying an Injunction Outweighs Injury to Defendants in Granting One.**

While Defendants contend that the harms to the Corps and downstream interests are sufficient to block issuance of the injunction, Plaintiffs argue that a balancing of the harms and benefits to the Missouri River Basin weighs greatly in favor of issuing an injunction. There is no denying that there will be

-59-

injury to Defendants, Intervenors, and the lower Basin states in general by granting a preliminary injunction. However, the degree of injury is extremely unclear because Defendants have failed to offer specific, concrete evidence of the economic harms they will face.

The most direct injury will be suffered by the seven barge companies that operate on the lower Missouri River and will be precluded from operating during the low flow period. However, the Court notes that the impacts of instituting low flow this summer would be similar to--although more severe than--the low summer flow experienced for eight days on the River last summer because of drought conditions--a summer navigation season which the barge companies did in fact survive. While Missouri has presented arguments of economic harm from increased transportation costs arising from loss of barge navigation, see Missouri Opp'n at 7-8, the extent of those impacts are purely speculative.[20] In addition, Plaintiffs argue that economic loss from decreased navigation on the Missouri River will be offset by benefits to navigation on the Mississippi River.

---

[20]     The State of Missouri has recently submitted an expert declaration which attempts to provide a less speculative analysis of losses.  However, as discussed above, the Court will be issuing this decision without reliance on any expert declarations given Defendants' Motions to Strike the expert declarations submitted by Plaintiffs.

Defendants have also argued that granting a preliminary injunction for low summer flow would negatively impact hydroelectric power or water quality interests. Low summer flow could well result in economic losses to hydroelectric power that would eventually be passed on to consumers who use that power. See MRES Opp'n at 12 (noting that consumers could experience a rate increase of approximately 3-20 percent). However, the Corps also concluded that during last year's drought conditions, low flow releases resulted in "no significant impacts to hydropower." Corps A.R., Doc. 1630 (Jan. 21, 2003 letter from Corps to Senator Nelson).

Even though Missouri may experience possible injury to its water quality during low flow periods, Missouri Opp'n at 8-9, the State of North Dakota argues that its water quality suffers when the Corps maintains high summer flow by drawing down its reservoirs. Indeed, the State of North Dakota has even filed a Clean Water Act, 33 U.S.C. § 1251 et seq., lawsuit against the Corps to protect its own water quality, see, generally, North Dakota's Statement of Position (citing North Dakota v. United States Corps of Engineers, et al., Civ. No. A1-03-050 (D.N.D.)).

Significantly, the economic analysis presented in the Revised Draft Environmental Impact Statement ("RDEIS") indicates that there will be substantial net economic benefits to the entire Missouri River Basin from implementing the 2000 BiOp RPA even with its

-61-

summer low flow. The Corps' detailed study did find that implementing the 2000 BiOp RPA, including summer low flow, would cause navigation interests to experience a loss of approximately 32% of benefits with interruption of the navigation season in mid-summer, see RDEIS at 14 (loss of approximately $2.25 million out of $7 million) and would cause water supply interests to experience a loss of less than 1 percent of benefits, see RDEIS at 16 (loss of approximately $1.6 million out of $610 million). Effects on hydroelectric power were more difficult to assess because an annual benefit of approximately $13 million would be offset by a loss in revenues attributed to redistribution costs. RDEIS at 14-15. Most importantly, however, the Corps concluded that changing to low summer flow would produce a total net economic benefit of approximately $8.8 million annually after consideration of all interests in the Missouri River Basin. RDEIS at 5-131, Table 5.13-1.

Defendants have presented primarily economic injuries that would result from issuing the requested injunction, but the Court finds that loss of the least tern, piping plover, and pallid sturgeon cannot be translated into such simple economic terms, because, as the Supreme Court has noted, the "value this genetic heritage is, quite literally, incalculable." TVA, 437 U.S. at 178 (quoting H.R. Rep No. 93-412, pp. 4-5 (1973)).

Consequently, in balancing the benefit to the Plaintiffs and the endangered species they represent from granting an injunction against the harms to the Defendants and the diverse interests they represent, the Court concludes that the balance weighs in favor of granting the injunction.   Congress has indeed "spoken in the plainest of words," making it abundantly clear that it has given the policy of conservation of endangered species "the highest of priorities." Id. at 194.  Thus, when as in this case, we weigh the benefits to two species near extinction and one threatened with extinction, whose loss will be "incalculable," against the temporary economic harm to seven barge companies, hydroelectric power interests, and consumers, especially in light of the total net economic benefits, the balance must be struck in favor of "the overwhelming need to devote whatever effort and resources [are] necessary to avoid further diminution of national and worldwide wildlife resources." Id. at 177 (quoting, with approval, Coggins, Conserving Wildlife Resources:    An Overview of the Endangered Species Act of 1973, 51 N.D.L.Rev. 315, 321 (1975)) (emphasis in Supreme Court quotation).

## F.   Public Interest Considerations Favor Granting the Preliminary Injunction.

Finally, Plaintiffs argue that public interest considerations should weigh greatly in favor of the three protected species. While this Court is not relying on the Supreme Court's decision in TVA v. Hill to conclude that public interest considerations under

-63-

the ESA must always be decided in favor of the endangered species,
see Strahan, 127 F.3d at 160 (finding that public interest
considerations were "answered" in favor of the endangered species),
Congress' enactment of the ESA clearly indicates that the balance
of interests "weighs heavily in favor of protected species."
Burlington N.R.R., 23 F.3d at 1510 (emphasis in original).

Moreover, the injunctive relief sought by Plaintiffs would not
only serve to protect the least tern, piping plover, and pallid
sturgeon, but would also serve to protect the entire Missouri River
Basin ecosystem.    See NRDC, F.Supp. 2d at 1053 (issuing an
injunction because it would serve the strong public interest
preserving endangered species as well as a healthy environment).
Until management of the Missouri River Basin is returned to a more
natural and historic state, "[d]egradation of the Missouri River
ecosystem will continue." NAS Report, Executive Summary at 3.
Finally, as already noted, the Corps found that implementing a
management plan with summer low flow would produce an overall net
economic benefit to the entire Missouri River Basin, see RDEIS at
5-131, Table 5.13-1 (noting a $8.8 million annual net economic
benefit).   Such economic benefits will also benefit the public in
general.

Defendants' most troubling public interest argument is that
issuing the injunction requested by Plaintiffs will conflict with
the action of the Eighth Circuit upholding the injunction issued by

-64-

the Nebraska District Court.[21]  This is a problem of the Defendant's
own making.   It is incomprehensible that none of the litigants
involved in the Eighth Circuit litigation--the United States
Department of Justice as well as the States of North Dakota, South
Dakota, and Nebraska--failed to bring to the attention of that
court the impact of the Endangered Species Act on the obligations
of the Corps of Engineers to manage the Missouri River Basin.   The
decision from the Eighth Circuit contains not a single reference to
the ESA, no less a discussion of the interrelationship between the
FCA and the ESA.   The failure of those parties--particularly the
Corps of Engineers which is no stranger to the issue or to
litigation--to surface that issue (complicated as it may be) is
hard to fathom.   Nor was counsel for the Corps able to shed any
light on the issue at the motions hearing in this case.

     In any event, unfortunate and uncomfortable as the situation
may be, it does not constitute a justification for this Court
abdicating its responsibilities under the applicable statutes.   The
public interest is served when the legislation that Congress has
enacted is complied with and federal agencies fulfill their
Congressional mandates.

     Accordingly, the Court finds that the public interest
considerations weigh in favor of enjoining the Corps from

---

[21]   Of course, this Court is not bound by any ruling of the
Eighth Circuit.

implementing the revised 2003 AOP without a summer low flow component.

## IV. Conclusion

Plaintiffs have established a likelihood of success on the merits of their ESA and APA claims against the Federal Defendants, and the least tern, piping plover, and pallid sturgeon will face irreparable harm if the Corps is not enjoined from implementing the revised 2003 AOP without a summer low flow component. Moreover, the balancing of harms and the public interest considerations weigh in favor of issuing an injunction against the Corps. Accordingly, Defendants' Motions to Strike are **denied as moot,** and Plaintiffs' Motion for Preliminary Injunction is **granted.** The Corps is hereby enjoined from implementing the summer water flow provisions of the revised 2003 AOP, from taking any action that would implement or be consistent with the provisions relating to summer water flow contained in the 2003 Supplemental BiOp, and from taking any action that would be inconsistent with the provisions relating to summer water flow contained in the 2000 BiOp.

7/12/2003                                            /s/
DATE                                          GLADYS KESSLER
                                              UNITED STATES DISTRICT JUDGE

-66-

**Copies To**:

David A. Becker, Esq.
David John Hayes, Esq.
Janice M. Schneider, Esq.
Julia A. Hatcher, Esq.
Latham & Watkins
555 Eleventh Street, N.W.
Suite 1000
Washington, D.C.  20004

Timothy D. Searchinger, Esq.
Environment Defense
1875 Connecticut Avenue, N.W.
Washington, D.C.  20009

Fred Russell Disheroon, Esq.
U.S. Department of Justice
Environment and Natural Resource Division
601 D Street, N.W.
Washington, D.C.  20004

James A. Maysonett, Esq.
U.S. Department of Justice
Environment & Natural Resources Division
Post Office Box 7369
Ben Franklin Station
Washington, D.C.  20044-7369

Charles M. Carvell, Esq.
ND Office of Attorney General
500 North Ninth Street
Bismarck, North Dakota  58501-4509

Joseph P. Bindbeutel
William J. Bryan
Shannon L. Haney
Missouri Attorney General's Office
Eighth Floor, Broadway Building
Post Office Box 899
Jefferson City, Missouri  65102

David D. Cookson
Attorney General's Office
2115 State Capitol
Lincoln, Nebraska  68509