# EXHIBIT 1

```
----------YKN ----------
15 JUL 2003
HR       GH         Q          PR
14       13.31      25.14
15       13.30      25.07
16       13.31      25.14
17       13.32      25.21
18**     13.32      25.21
19       13.31      25.14
20       13.32      25.21
21       13.32      25.21
22       13.31      25.14
23       13.30      25.07
24**     13.31      25.14
16 JUL 2003
 1       13.32      25.21
 2       13.32      25.21
 3       13.33      25.27
 4       13.32      25.21
 5       13.32      25.21
 6**     13.32      25.21
 7       13.32      25.21
 8       13.33*     25.30*
 9       13.33      25.27
10       13.32      25.21
11       13.33      25.27
12**     13.32      25.21
13       13.32      25.21
14       13.32      25.21
15       13.31      25.14
16       13.33      25.27
17       13.34      25.34
18**     13.34      25.34
19       13.33      25.27
20       13.33      25.27
21       13.33      25.27
22       13.33      25.27
23       13.33      25.30
24**     13.33      25.30
17 JUL 2003
 1       13.32      25.20
 2       13.32      25.21
 3       13.31      25.14
 4       13.31      25.14
 5       13.31      25.14
 6**     13.32      25.21
 7       13.32      25.21
 8       13.32      25.21
 9       13.33      25.27
10       13.34      25.34
11
12**
13
```

 **DCP Data**

Pagemaster:
Internet E-Mail Address: Water.Management@usace.army.mil
Document Date: 18-Sep-96

# EXHIBIT 2

```
From:     NWD-MR, RCC-MAIL  NWD02
Sent:     Thursday, July 17, 2003 1:04 PM
To:       DLL-CENWO-GP-Operator
Cc:       NWD-MR, RCC-MAIL  NWD02
Subject:      7/17 GAPT PPO#108
GAPT/REHC
```

Combined Res Reg / Power Prod Order No. 108
Effective from 0000 Hrs: 18 Jul 03
Through 2400 Hrs: 18 Jul 03

(A)　Daily Release Schedule (Avg Discharge in cfs) -   25,000

(B)　Daily Generation Schedule in MWh - 2,200
　　　　Maximum Allowable - As Reqd.
　　　　Minimum Allowable - As Reqd.

(C)　Hourly Power Limitations in 1,000 kW
　　　　Maximum - N.A.
　　　　Minimum - N.A.

(D)　Apply Provisions of Order No. ST-1, 1989.

　　　　　　　　Cieslik

---

 *Current Conditions*

---

Pagemaster: Water Management; CENWD-CM-W-M
Internet E-Mail Address: Water.Management@usace.army.mil
Document Date: 01-Mar-02

# EXHIBIT 3



# News Release

**US Army Corps
Of Engineers**
Headquarters

Release No. PA-03-18

For Release:
**Immediate**

Contact:

**Paul Johnston**      **402-697-2552**
Paul.T.Johnston@nwd02.usace.army.mil

**Homer H. Perkins**      **503-808-3710**
Homer.H.Perkins@nwd01.usace.army.mil

**World Wide Web:** www.usace.army.mil
**News Release:**   http://www.hq.usace.army.mil/cepa/releases/MoRiver.htm

---

## Federal Agencies Reach Agreement on Course of Action for Missouri River

**WASHINGTON** (July 15) – The Department of the Army and the U.S. Fish and Wildlife

Service announced steps to resolve management issues on the Missouri River and attain the

recovery of federally-protected Missouri River species and the Missouri River ecosystem.  The

Bush Administration also announced it is adding $42 million to the 2004 budget for Missouri

River ecosystem restoration.

The steps include ecosystem restoration and the beginning of formal consultation Monday,

July 21, 2003 on a new Biological Assessment under the Endangered Species Act.  Over the

past year, the agencies have made great progress in resolving complex and controversial

endangered species issues during the informal consultation period and expect this spirit of

cooperation to continue.

Pursuant to the understanding between the Army Corps of Engineers (Corps) and U.S. Fish

and Wildlife Service reached in informal consultation, the Missouri River Master Control Manual

will be completed this year and implemented in Spring 2004, with a Final Environmental Impact

Statement to include a Preferred Alternative available for public review and comment this fall.  A

Record of Decision is anticipated this winter.   The Corps plans to serve all congressionally

authorized purposes of the system of dams and reservoirs while complying with the Endangered

Species Act.  The Corps' Biological Assessment does not contemplate the need to employ a

spring rise or lower summer release from the Gavins Point Dam to provide for the recovery of

the federally-protected Missouri River species.

**-MORE-**

**Federal Agencies Reach Agreement on Course of Action for Missouri River/2-2-2**

The Administration is committed to the restoration of the Missouri River and the resolution of these conflicts, and the addition of  $42 million to the 2004 budget for Missouri River ecosystem restoration will allow the Corps to undertake the following steps:

- Habitat creation, enhancement, and maintenance for the least tern, piping plover, and pallid sturgeon,

- Population assessment for all three species,

- Hatchery support including facility improvements, accelerated brood stock collection, and accelerated stocking for the pallid sturgeon,

- Intense research, monitoring, and evaluation of all three species to include studies to determine the limiting factors which may be impacting pallid sturgeon spawning and recruitment in the Missouri River,

- Innovative flow tests as part of an adaptive management strategy.

A restoration effort of this scale is unprecedented.  It will require the long-term commitment and participation of the nation to achieve success.   The Missouri River is the longest river in the nation, and drains one-sixth of the country, including all or part of nine states.  The six dams and reservoirs that make up the Missouri River System are the largest reservoir system in North America.  Thirteen Native American reservations or Tribal lands are located directly on the System.  The Corps operates the system to serve the Congressionally authorized purposes of flood control, navigation, irrigation, hydropower, water supply, water quality, recreation, and fish and wildlife.

Currently, the Corps is under two conflicting court orders concerning operation of the river that are irreconcilable.  One order, issued by the US District Court in Nebraska in May 2002 and affirmed by the US Court of Appeals for the 8th Circuit on June 4, 2003, requires the Corps to maintain sufficient flows for navigation as called for under the existing Missouri River Master Manual and the current Annual Operating Plan.   An injunction issued by the U. S. District

**-MORE-**

**Federal Agencies Reach Agreement on Course of Action for Missouri River/3-3-3**

Court for the District of Columbia on July 12, 2003 prohibits the Corps from implementing the

summer flows set forth in the 2003 Annual Operating Plan and 2003 Supplemental Biological

Opinion.

The Corps believes that the 2003 Supplemental Biological Opinion is legally and scientifically

valid.  Operation of the Missouri River system has not resulted in any loss of the listed tern or

plover this year.  The Department of Justice request for a stay of the D.C. District Court

injunction was denied this morning.  This afternoon, a notice of appeal was filed with the Court,

and a request for a stay pending appeal will be filed with the US Circuit Court of Appeals for the

District of Columbia.  After July 15, it is impossible to simultaneously comply with the conflicting

flow requirements contained in the two orders.   Until a ruling is obtained from the DC Circuit,

the Corps plans to continue operating under the 2003 Supplemental Biological Opinion and in

compliance with the order of the District Court in Nebraska.


**EDITOR'S NOTE:**

*Questions concerning this news release can be referred to Paul T. Johnston, U.S. Army*

*Corps of Engineers Northwest Division Public Affairs Office at 202-395-7644, or to Mark Pfeifle*

*or Hugh Vickery, Department of the Interior Public Affairs, at 202-208-6416.*


**-30-**

# EXHIBIT 4

No. 03-

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

AMERICAN RIVERS, ET AL.

Plaintiffs-Appellees

v.

THE UNITED STATES ARMY CORPS OF ENGINEERS, ET AL.

Defendants-Appellants

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**EMERGENCY MOTION OF FEDERAL APPELLANTS,
THE U.S. ARMY CORPS OF ENGINEERS, ET AL.,
FOR STAY OF INJUNCTION PENDING APPEAL**

FRED DISHEROON
JAMES MAYSONETT
JOHN T. STAHR
ROBERT OAKLEY
U.S. Department of Justice
Environment & Natural Resources Division,
Appellate Section
P.O. Box 23795 L'Enfant Plaza Station
Washington, D.C.  20026
(202) 514-4081

## TABLE OF CONTENTS

**PAGE**

A.   INTRODUCTION AND SUMMARY . . . . . . . . . . . . . . . . . . . . . . .   1

B.   THE ENDANGERED SPECIES ACT . . . . . . . . . . . . . . . . . . . . . .   4

C.   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

    1.   The Corps' Operation of the Main Stem System . . . . . . . . . . . . .   6

    2.   Biological Consultation under the ESA . . . . . . . . . . . . . . . . . .   7

    3.   The 2003 AOP and Supplemental Biological Opinion . . . . . . . . .   8

    4.   District Court Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . .   10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

I.   THE FEDERAL DEFENDANTS HAVE A HIGH PROBABILITY
    OF SUCCESS ON THE MERITS . . . . . . . . . . . . . . . . . . . . . . . . . .   12

II.   THE CORPS IS IRREPARABLY HARMED BECAUSE IT
    HAS BEEN  DIRECTED BY TWO DIFFERENT DISTRICT
    COURTS TO COMPLY  WITH TWO CONFLICTING
    INJUNCTION ORDERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

III.   A STAY WILL NOT IRREPARABLY HARM AMERICAN RIVERS   18

IV.   THE PUBLIC INTEREST WARRANTS A STAY . . . . . . . . . . . . . . .   19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

CERTIFICATE OF SERVICE

PAGE

## STATUTES, RULES AND REGULATIONS:

Endangered Species Act,
    Section 7(a)(2), 16 U.S.C. 1536(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,4,5,9
    Section 7(a)(3)(A), 16 U.S.C. 1536(b)(3)(A) . . . . . . . . . . . . . . . . . . . . . . 4
    Section 7(b)(4)(i)(ii), 16 U.S.C. § 1556(b)(4)(i)-(ii) . . . . . . . . . . . . . . . . 5
    Section 7(o), 16 U.S.C. 1536(o) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    Section 7(o)(2), 16 U.S.C. 1536(o)(2) . . . . . . . . . . . . . . . . . . . . . . . . . 5,18
    Section 9, 16 U.S.C. 1538 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Section 9(a)(1)(B), 16 U.S.C. § 1538(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . 3
    16 U.S.C. 1531(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D.C. Cir. Rule 8(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Fed. R. App. P. 8(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

50 C.F.R. 17.31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
50 C.F.R. 12(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
50 C.F.R. 402.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,4
50 C.F.R. 402.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## MISCELLANEOUS:

Master Manual § 9-17, 10-16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,15

PAGE

## TABLE OF AUTHORITIES

**CASES:**

Al-Fayed v. CIA, 254 F.3d 300 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 11

American Rivers v. Corps of Engineers, No. 03-00241-GK
  (D.D.C. May 21, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,17

Ethyl Corp. v. EPA, 541 F.2d 1 (D.C. Cir.1976) . . . . . . . . . . . . . . . . . . . . . . 11

Louisiana ex rel. Guste v. Verity, 853 F.2d 322 (5th Cir. 1988) . . . . . . . . . . . 12

Mt. Graham Red Squirrel v. Espy, 986 F.2d 1568 (9th Cir. 1993) . . . . . . . . . 11

National Railroad Passenger Corporation v. Express Trac L.L.C. 330 F.3d 523
  (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Nebraska v. Ubbelohde, Case No. 8:02CV217 (D. Neb. May 13, 2002),
  aff'd sub nom. South Dakota v. Ubbelohde, 330 F.3d 1014
  (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,6,14,15

Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC,
  962 F.2d 27 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Tribal Village of Akutan v. Hodel, 869 F.2d 1185 (9th Cir. 1988) . . . . . . . . . . . 5

South Dakota v. Ubbelohde, ___ F.3d ___, 2003 WL 21276235 . . . . . . . . . . . 20

Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.,
  559 F.2d 841 (D.C. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,11

Water Keeper Alliance v. United States Dep't of Defense, 271 F.3d 21
  (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n, 259 F.2d 921
  (D.C. Cir. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## A. INTRODUCTION AND SUMMARY

Pursuant to Fed. R. App. P. 8(a), federal appellants, the United States Army Corps of Engineers (the "Corps") and the United States Fish and Wildlife Service (the "Service") (collectively, the "Federal Defendants"), et al., respectfully move for entry of a stay pending appeal of a preliminary injunction entered by the district court on July 12, 2003. That order directs the Corps to restrict immediately the discharge of water from its Missouri River Main Stem System of dams and reservoirs during the summer. The district court concluded that if the higher flows were allowed to continue indefinitely, at some point these flows would threaten one threatened (piping plover) and one endangered (interior least tern) species of bird, and one endangered species of fish (pallid sturgeon, in violation of the Endangered Species Act ("ESA"). To comply with the district court's order, the Corps must restrict the flow from its southernmost Main Stem dam (Gavins Point) to 21,000 cubic feet per second ("cfs") no later than July 15, 2003.[1/]

However, if the Corps implements this flow level, it will be immediately in violation of an injunction issued by the District Court of Nebraska, which has ordered the Corps to "maintain minimum navigation flows" on the Missouri River. Nebraska v. Ubbelohde, Case No. 8:02CV217 (D. Neb. May 13, 2002), aff'd sub nom. South Dakota v. Ubbelohde, 330 F.3d 1014, 1033 (8th Cir. 2003). As described by the Eighth Circuit, explicit provisions of the Master Manual governing operations on the river "require the Corps to maintain minimum flow levels at various points on the river at different times." 330 F.3d at 1028. Both the District of Nebraska and the Eighth Circuit found that these provisions require the maintenance of minimum navigation flows. A reduction of

---

[1/]     The district court's order does not include that deadline, but rather requires compliance with the 2000 Biological Opinion. As discussed below, this document would requires that flows be reduced to 21,000 cfs no later than July 15 of each year.

flows to 21,000 cfs from Gavins Point on July 15th would immediately violate the terms of the injunction although navigation would not actually end on some stretches of the Missouri River until July 17, 2003. Indeed, the district court admits that its order will terminate navigation at some point during the summer. Opin. at 59-60.

The district court was well aware that granting the preliminary injunction in this case would conflict with the injunction issued by the District of Nebraska and affirmed by the Eighth Circuit. The District Court describes this outcome as "unfortunate and uncomfortable" but nevertheless issued the injunction noting that "this Court is not bound by any ruling of the Eighth Circuit." Opin. at 65 & n. 21.

Foreseeing this exact possibility, Federal Defendants sought to avoid conflicting orders by moving to transfer this case to the District of Nebraska on February 21, 2003. At that time, Federal Defendants argued that there was a "real risk" that the Corps "could be subject to conflicting orders from both this Court and the District of Nebraska." Federal Defendants' Memorandum in Support of Motion to Transfer Venue, at 9-12. Nevertheless, on May 21, 2003, the D.C. District Court denied that motion, partly on the grounds that "there may simply be no way to avoid conflicting decisions amongst the federal district and circuit courts with regards to the Corps' management of the Missouri River." American Rivers v. United States Army Corps of Engineers, No. 03-00241-GK, at 12 (D.D.C. May 21, 2003)

In addition to the harm faced by the Corps, the district court's order would also injure the public interest. Because it requires immediate curtailment of releases from the Main Stem reservoirs, the district court's order would result in damage to barges now on the river. The curtailment of the river's navigation season will also cause economic harm to the barge companies

-2-

and their customers who depend on the river as a means of moving goods. In contrast, the plaintiffs will not be irreparably harmed by the granting of a stay. Allowing the Corps to maintain higher flows on the river will not threaten the existence of any of the endangered or threatened species involved in this case.

On July 14, 2003, the Federal Defendants filed a motion for a stay pending appeal with the district court, which the court denied on July 15th. Because the Corps must now choose to either comply with the order issued by the Nebraska district court or with the order issued by the district court here, it has, after careful consideration, chosen to remain in compliance with Nebraska district court's order. This decision was based on the Eighth Circuit's ruling in <u>Ubbelohde</u>, the balance of harms, and the public interest.

The Corps expects the plaintiffs in this case to seek contempt proceedings immediately. Accordingly, the basis for the stay is to prevent the Corps from being subjected to contempt proceedings and the public from suffering irreparable harm as described in greater detail below if compliance with this district court's order is compelled. Finally, as we show below, the district court's injunction is likely to be overturned on the merits. For these reasons, the Federal Defendants request that a stay be granted and that this motion be ruled on as soon as possible, or no later than close of business July 18, 2003.

### B.   THE ENDANGERED SPECIES ACT.

The Endangered Species Act ("ESA") contains both substantive and procedural requirements designed to promote its goal of conserving endangered and threatened species and the ecosystems on which they depend. 16 U.S.C. § 1531(b). The requirements that are relevant to this case are the

statute's prohibition on the "take" of listed endangered and threatened species, set out in Section 9, and the consultation requirements contained in Section 7(a)(2).

Unless certain provisions are complied with, Section 9 of the ESA makes it unlawful for any person (including the federal government) to "take" a species which has been listed as endangered or threatened. ESA § 9(a)(1)(B), 16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. § 17.31. "Take" is defined in the statute as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect . . . ." ESA § 3(19), 16 U.S.C. § 1532(19). "Harm" has been further defined to include "significant habitat modification or degradation" that "<u>actually</u> kills or injures wildlife." 50 C.F.R. § 17.3.

Section 7(a)(2) of the ESA provides that each Federal agency "shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . ." 16 U.S.C. § 1536(a)(2). Section 7(a)(2) imposes both a substantive obligation (to ensure that agency actions are not likely to "jeopardize" the continued existence of listed species) and a procedural obligation (to consult with the appropriate agency).

To comply with Section 7(a)(2), the acting federal agency is required to review its actions to determine whether they "may affect listed species or critical habitat." 50 C.F.R. § 402.14. If so, the action agency must consult with either the United States Fish and Wildlife Service (the "Service") or the National Marine Fisheries Service ("NMFS"), depending on the kind of species at issue. The action agency may, but is not always required to, prepare a "biological assessment" to evaluate the potential effects of a proposed action. 50 C.F.R. § 402.12(a).

After a formal consultation, the consulting agency (the Service or NMFS) will issue a "biological opinion" describing how the proposed action may affect the listed species at issue. ESA § 7(a)(3)(A), 16 U.S.C. 1536(b)(3)(A). That biological opinion will include the consulting agency's conclusion on whether the proposed action is likely to jeopardize the continued existence of the affected species or result in the destruction or adverse modification of its designated critical habitat. 50 C.F.R. § 402.14.

If the consulting agency finds that the proposed action is likely to jeopardize the continued existence of a listed species, it will suggest any "reasonable and prudent alternatives" ("RPAs") that can be implemented as an alternative to the proposed action and which would not be likely to result in jeopardy. Id. § 1536(a)(3)(A). RPAs only include those actions that: (1) can be implemented in a manner consistent with the intended purpose of the action; (2) can be implemented consistent with the scope of the action agency's legal authority and jurisdiction; (3) are economically and technologically feasible; and (4) would avoid the likelihood of jeopardizing the continued existence of listed species or destroying or adversely modifying critical habitat. 50 C.F.R. § 402.02. The action agency is not required to implement the RPA proposed by the Service (or NMFS). See, e.g., Tribal Village of Akutan v. Hodel, 869 F.2d 1185, 1193 (9th Cir. 1988) (holding that "[t]he agency is not required to adopt the alternatives suggested in the biological opinion . . . ."). If the action agency does not implement the RPA, that "does not by itself constitute a violation of [the] ESA" and the action agency may still satisfy its obligations under Section 7(a)(2) if it takes "alternative, reasonably adequate steps to insure the continued existence of any endangered or threatened species." Id.

If the Service (or NMFS) determines that the proposed action – whether standing alone or as modified by an RPA – is not likely to jeopardize the species, but may result in the incidental "take" of some members of an endangered or threatened species, the consulting agency provides an "incidental take statement" along with the biological opinion.   16 U.S.C. § 1556(b)(4)(i)-(ii). "[I]ncidental take" is defined as "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.02. Under ESA § 7(b)(4)(i)-(ii), the incidental take statement must specify the impact of the incidental take on the species and specify those reasonable and prudent measures ("RPMs") that the Service or NMFS considers "necessary or appropriate to minimize such impact." 16 U.S.C. § 1536(b)(4)(i)-(ii). Any take that is in compliance with a written incidental take statement does not violate Section 9 of the ESA because the ESA provides that it "shall not be considered to be a prohibited taking of the species concerned." ESA § 7(o)(2), 16 U.S.C. § 1536(o)(2).

## C.   FACTUAL BACKGROUND

**1. The Corps' Operation of the Main Stem System** –The Corps operates six dams and reservoirs on the Missouri River, known as the Main Stem System. Gavins Point, the dam located furthest downstream, is the point from which water from the upstream reservoirs is released to support navigation and other downstream uses of the Missouri River. Long term guidance for operation of the Main Stem System is set out in the Missouri River Main Stem Reservoir System Master Reservoir Regulation Manual (the "Master Manual"). The most recent revision of the Master Manual was published in 1979, and a revised Master Manual will be issued this Fall, to be implemented in Spring 2004. Declaration of Les Brownlee, Acting Assistant Secretary of the Army for Civil Works.

Under the Master Manual, the Corps' first priority is flood control. Federal Defendants' Exhibits (Exs.) at 113. The next priorities are navigation, irrigation, water supply and water quality, and power production. Exs. at 113-14 Finally, the Master Manual permits the Corps to operate the Main Stem System for the benefit of recreation, fish, and wildlife, but only if this purpose does not interfere with the other purposes of the system. Exs. at 114. In addition to setting general goals, the Manual also provides for more specific guidance to operating the System, setting out, for example, "minimum flows that are to be maintained at different points on the River, Master Manual Section 9-17, and methods for deciding the length of the navigation season based upon river flows at certain times of the year. Master Manual Section 9-18." South Dakota v. Ubbelohde, 330 F.3d at 1020.

The Corps also produces an "Annual Operating Plan" ("AOP") that describes its proposed operations for the Main Stem System for the coming year, to achieve the objectives set out in the Master Manual. The Corps' issued the AOP for its Missouri River operations during 2003 was issued in January 2003.

    **2. Biological Consultation under the ESA** -- In November 2000, following extensive consultations with the Corps, the Service issued a comprehensive biological opinion which concluded that the Corps' Missouri River operations at that time were "likely to jeopardize the continued existence of the least tern, piping plover, and pallid sturgeon . . ." Exs. at 139-140. The 2000 BiOp also identified a "reasonable and prudent alternative" ("RPA") that would avoid jeopardy. Exs. at 140-41. Among other things, the RPA recommended that releases from Gavins Point produce "a spring rise and a summer drawdown" to protect habitat for the least tern, piping plover, and pallid sturgeon. Exs. at 140. The 2000 BiOp required a reduction of flow levels at Gavins Point to 21,000 cfs for the period July 15-August 15 of each year; flows could then be

-7-

increased to 25,000 cfs until September 1, after which all restrictions imposed by the BiOp would be removed. Exs. at 404-05. The RPA in the BiOp also included an "incidental take statement" that identified the anticipated amount of take under the RPA (and exempted the Corps from liability for that take), as well as "reasonable and prudent measures" ("RPMs") to minimize that incidental take. Exs. at 427-41.

3. **The 2003 AOP and Supplemental Biological Opinion** -- Because of concerns that continued drought conditions would excessively deplete the upstream reservoirs, the Corps' 2003 AOP proposed to adopt a "flow-to-target" plan to release water from the reservoirs to maintain downstream uses. Under this plan, flows from Gavins Point would not be steady. Rather, they would start with a release in the spring and then gradually increase throughout the summer as necessary to meet minimum navigation needs. Exs. at 535. The Corps concluded this flow-to-target alternative would save "nearly 250,000 acre feet of water in the three biggest reservoirs that could reduce the anticipated decline in the reservoirs by 4 to 18 inches . . . ." Id.

The Corps also recognized that while the flow-to-target alternative would keep more water in the system, it might also affect two endangered species – the interior least tern and the piping plover. The tern and the plover make their nests during the summer on sandbars and islands in the river. If flows are increased over the summer, the rising water levels might flood some of those nests. To prevent or at least minimize the effects of rising water levels on these endangered species, the Corps proposed as part of the flow-to-target alternative that it would identify and move tern and plover nests at risk of flooding to higher ground when possible. Ibid.

The Corps then entered into formal consultation with the Service to determine whether the flow-to-target alternative would be consistent with the Corps' obligations under Section 7(a)(2) of

the ESA. In their consultations on the Corps' 2003 AOP, the Corps and the Service concluded that an adjustment to the "flow-to-target" alternative described in the 2003 AOP would both comply with the ESA and give the Corps enough flexibility to operate the system during existing drought conditions. Under the hybrid plan, which is described in the Corps' Additional Supplemental Biological Assessment ("ASBA"), the Corps would begin releases from Gavins Point in early to mid-May at 26,000 cfs. Exs. at 581-82. This lower level of release would initially expose more sandbar and island habitat than other alternatives considered (Exs. at 581-82), but also flood the lowest-lying sandbars and islands before the beginning of the tern and plover nesting season. Exs. at 581. This ensures that terns and plovers would not nest on that low-lying habitat, which would be at the greatest risk of flooding if flows were increased over the summer. Exs. at 581.

Once the tern and plover nesting season had begun, releases from Gavins Point would be held steady until increases are needed to support minimum downstream navigation flow targets. Exs. at 581. Depending on the exact conditions on the river, the Corps anticipated that the flow-to-target increases to support minimum navigation service would begin some time in early July. Exs. at 583. The Corps selected this plan, in consultation with the Service, "to minimize the loss of interior least tern and piping plover habitat and loss of eggs and chicks, to provide water conservation in the upper three reservoirs, and to minimize operation uncertainty for navigation." Exs. at 581. On April 21, 2003, the Service issued a Supplemental Biological Opinion that concluded that the Corps' proposed Missouri River operations for the summer of 2003 would be consistent with the Corps' obligations under ESA Section 7(a)(2).

The Service recognized that the Corps' operations might result in the incidental take of tern and plover eggs and chicks through flooding of their nests. The Service concluded that the levels

of take resulting from this flooding "are encompassed within the anticipated level of take identified in the November 2000 biological opinion." Exs. at 641. The Service estimated that this anticipated take would only be between 1% and 7.5% of the least terns fledged in 2003, and between 1% and 4.5% of the plovers fledged. Ex. at 644. The Service thus concluded that the Corps' operations for this summer would not be likely to jeopardize the continued existence of either the tern or the plover. Ibid.[2]

4.   **District Court Proceedings** -- As amended, plaintiffs' complaint asserts numerous violations of the ESA, including claims that the Service's 2003 Supplemental Biological Opinion is arbitrary and capricious, and that the Corps is failing to comply with the 2000 Biological Opinion, and is therefore "taking" endangered and threatened species. On February 21, 2003, the Corps and Service moved to transfer the case to the District of Nebraska, asserting that there was a "real risk" that the Corps "could be subject to conflicting orders from both this Court and the District of Nebraska." See Def. Mem. in Support of Motion to Transfer Venue, at 9-12. The district court subsequently denied the motion, in part because "there may simply be no way to avoid conflicting decisions amongst the federal district and circuit courts with regards to the Corps' management of the Missouri River." See American Rivers v. Corps of Engineers, No. 03-00241-GK, at 12 (D.D.C.

---

[2]      The Service also concluded that no harm would come to the pallid sturgeon as a result of the flow changes. In the 2000 Biological Opinion, the Service found that whatever limited natural reproduction is currently occurring among pallid sturgeon in the wild on the Missouri River is not contributing to a self-sustaining population. Exs. at 387. The RPA identified in that biological opinion requires the Corps to restore significant amounts of habitat for the pallid sturgeon. Id. at 243-44. Under the schedule set out in the RPA, however, the Corps will only begin restoring habitat in 2004. Id. In the meantime, and until natural reproduction on the Missouri River can contribute to a self-sustaining population, the Service has been maintaining the pallid sturgeon population by stocking the river with year-old pallid sturgeon raised in hatcheries. Exs. at 638.

May 21, 2003). Intervenor-defendant Nebraska subsequently filed a motion seeking to have the case

this case (and several other cases currently pending in the Eighth Circuit) transferred to and

consolidated before a single district court under the procedures of the Judicial Panel on Multidistrict

Litigation.  Oral argument on that request is scheduled for July 2003.

The plaintiffs moved for a preliminary injunction to require the Corps to comply with the

flow levels set forth in the 2000 BiOp.  On Saturday, July 12, 2003, the district court granted

plaintiffs' request, ruling that:

> The Corps is hereby enjoined from implementing the summer water flow provisions
> of the revised 2003 AOP, from taking any action that would implement or be
> consistent with the provisions relating to summer water flow contained in the 2003
> Supplement BiOp, and from taking any action that would be inconsistent with the
> provisions relating to summer water flow contained in the 2000 BiOp.

Opin. at 66.

## ARGUMENT

In determining whether to grant a stay pending appeal, this Court considers: (1) the likelihood

of success on the merits; (2) the threat of irreparable harm to the moving party if the stay is withheld;

(3) the possibility of substantial harm to other parties if the stay is granted; and (4) the public

interest.  D.C. Cir. Rule 8(a)(1); see Washington Metropolitan Area Transit Comm'n v. Holiday

Tours, Inc., 559 F.2d 841 (D.C. Cir. 1977); Virginia Petroleum Jobbers Ass'n v. Federal Power

Comm'n, 259 F.2d 921 (D.C. Cir. 1958).  To obtain a stay, a party must establish either: (1) a

likelihood of success on the merits and a possibility of irreparable injury; or (2) the existence of

serious questions on the merits and a balance of hardships tipping in its favor.  Holiday Tours, 559

F.2d at 843-844.

The Court reviews the district court's weighing of the preliminary injunction factors for abuse of discretion, its factual findings for clear error, and legal conclusions de novo. Al-Fayed v. CIA, 254 F.3d 300, 303-304 (D.C. Cir. 2001).

## I. THE FEDERAL DEFENDANTS HAVE A HIGH PROBABILITY OF SUCCESS ON THE MERITS.

The Corps and the Service have a strong likelihood of prevailing on the merits (1) because the district court failed to give the decisions of the Federal Defendants' the full deference to which they are entitled under the APA arbitrary and capricious standard of review; (2) because the district court abused its discretion by issuing the preliminary injunction despite the conflict with the Eighth Circuit's affirmance of the Nebraska injunction in Ubbelohde; and (3) because of the district court's denial of the Federal Defendants' motion to transfer this case to Nebraska.

First, the standard of review under the APA is "highly deferential," and "presumes agency action to be valid." Ethyl Corp. v. EPA, 541 F.2d 1, 34 (D.C. Cir.1976). Deference to a federal agency's decision "is especially appropriate where . . . the challenged decision implicates substantial agency expertise." Mt. Graham Red Squirrel v. Espy, 986 F.2d 1568, 1571 (9th Cir. 1993) (citations omitted). Indeed, deference to the agency is "greatest when reviewing technical matters within its area of expertise, particularly its choice of scientific data and statistical methodology." Louisiana ex rel. Guste v. Verity, 853 F.2d 322, 329 (5th Cir. 1988) (footnote omitted).

In its 2003 Biological Opinion, the Service concluded that the Corps' proposed actions for this summer were a suitable replacement for the low summer flow component of the RPA set out in the Service's 2000 Biological Opinion (but only for this summer). Exs. at 638. The Service included an "incidental take statement" in the 2003 Biological Opinion for the limited incidental take that may occur as a result of the Corps' operations this summer. Exs. 640-42.

-12-

The 2003 Biological Opinion supplemented the Service's analysis in the 2000 Biological Opinion. In the 2000 Biological Opinion, the Service had concluded that the Corps could operate the Main Stem System without jeopardizing the continued existence of the tern, the plover, and the pallid sturgeon if the Corps implemented the RPA described in that opinion. The limited question resolved in the 2003 Biological Opinion was whether the Corps' proposed operations for this summer could be implemented consistently with the 2000 Biological Opinion's RPA.

The Service rationally concluded that they could. The Service concluded that, although some tern and plover nests might be flooded, the number of individual eggs and chicks that were likely to be lost would not be so great that it would jeopardize the continued existence of either species. Exs. 638, 640-41. To account for possible variations in the timing and magnitude of such flows, the Service used a model to estimate the amount of take that might occur. Exs. 634. That model predicted tern and plover losses of between 15 and 121 birds. Exs. at 636. Specifically, the Service anticipated the loss of between 4 and 50 terns and between 11 and 71 plover. Exs. at 640-41. This take would occur directly through the flooding of nests. Exs. at 640. The Service also considered, but could not quantify, additional indirect take that would occur as a result of reduced suitable habitat and reproductive success. Exs. at 641. Those levels of take, the Service determined, "are encompassed within the anticipated level of take identified in the November 2000 biological opinion." Exs. at 641. Accordingly, neither the Corps' 2003 AOP nor the Service's Supplemental BiOp is inconsistent with the 2000 BiOp, and neither is arbitrary and capricious.

Although the district court complains that the Corps has not yet committed to future measures that will ensure no jeopardy for the endangered and threatened species on the River (Opin. at 44-46 & n. 16), the ESA does not require that all threats to species be resolved at once. As discussed

above, the Corps has committed to publication this year of a new Master Manual that will go into effect next spring, and will require compliance with ESA obligations. Brownlee Declaration. Thus, the 2003 Supplemental BiOp and 2003 AOP does not reflect an abdication of the Corps' responsibilities under the ESA.

**Second**, Federal Defendants are also likely to prevail because the district court abused its discretion by requiring the Corps to take actions inconsistent with a binding district court order affirmed by the Eighth Circuit. In Ubbelohde, the Eighth Circuit maintained an injunction issued by the Nebraska district court that requires the Corps to maintain specific navigation flows subject to exceptions not applicable here. 330 F.3d at 1020; see also Master Manual §§ 9-17, 10-16 (allowing release reductions below "minimum navigation service level . . . only when it appears positive that the reductions will be of benefit from the flood control standpoint.").

The district court's order will result in the end of navigation on parts of the Missouri River beginning on July 17, 2003, absent an unexpected and large amount of rain. Cieslik Declaration , ¶ 4. The district court admits in its opinion that its order will curtail navigation on the Missouri River. Opin. at 60-61. Thus, the district court's order is inconsistent with the holding of the Eighth Circuit's affirmance of the Nebraska district court's injunction. While that decision does not control the district court, a decision of a sister court of appeals is entitled to great weight. The district court's indifference to this conflict is an abuse of discretion.

**Third**, and closely connected with the district court's indifference to Ubbelohde, is the harm it caused when it denied the Federal Defendants' motion to transfer the case to Nebraska. This transfer would have preserved judicial efficiency because it would have ensured that the court that issued an injunction requiring navigation to be maintained on the River would also hear plaintiffs'

-14-

claims that the flows necessary for navigation violated the ESA.  The reason given by the district court for denying the motion, that conflicts among the federal courts over management of the Missouri River system was inevitable, was a self-fulfilling prophecy. Certainly, there would have been no conflict if the Nebraska district court has been allowed to decide this case.[3/]

Accordingly, the Federal Defendants have a likelihood of success on the merits.

## II.  THE CORPS IS IRREPARABLY HARMED BECAUSE IT HAS BEEN DIRECTED BY TWO DIFFERENT DISTRICT COURTS TO COMPLY WITH TWO CONFLICTING INJUNCTION ORDERS.

The Corps will be irreparably harmed by the preliminary injunction because the district court order subjects the Corps to two different and conflicting district court injunctions.  The Corps' operation of the Missouri River Main Stem System is already subject to an injunction issued by the United States District Court for the District of Nebraska. Nebraska v. Ubbelohde, Civ. No. 8:02-CV-217 (D. Neb. May 13, 2002).  A copy of that injunction is attached.  Under the District of Nebraska's injunction, the Corps is required to operate the Missouri River Main Stem System:

(1) "in accordance with the 1979 Master Manual and current Annual Operating Plan;" and

(2) "so as to maintain the minimum navigation flows below Gavins Point Dam as identified in the 1979 Master Manual and current Annual Operating Plan."

Nebraska v. Ubbelohde, Civ. No. 8:02-CV-217, at 6 (emphasis supplied).

The "minimum navigation flows" that the Nebraska district court injunction requires – that is, those flows that are "identified in the 1979 Master Manual" – are defined target flows.  See

---

[3/]    The Federal Defendants recognize that normally denial of a motion to transfer is not an appealable order.  However, this issue is so closely tied up with the merits of plaintiffs' claims and this injunction that this issue is appropriate for the exercise of pendent appellate jurisdiction.  See National Railroad Passenger Corporation v. Express Trac L.L.C. 330 F.3d 523 (D.C. Cir. 2003).

Master Manual § 9-17. Exs. 120-21. Under the district court's injunction order here, however, the Corps is now also enjoined:

> from implementing the summer water flow provisions of the revised 2003 Annual Operation Plan, from taking any action that would implement or be consistent with the provisions relating to summer water flow contained in the 2003 Supplemental Biological Opinion, and from taking any action that would be inconsistent with the provisions relating to summer water flow contained in the 2000 Biological Opinion.

Opin. at 66. As a result of the drought prevailing on the Missouri River this year, however, the Corps cannot comply with both that preliminary injunction order and with the Nebraska district court's order to maintain "minimum navigation flows" Cieslik Declaration, ¶¶ 3-4.

As explained by Lawrence J. Cieslik, Chief of Missouri River Basin Water Management, to comply with the district court's order, the Corps would need to reduce releases to 21,000 cfs by July 15th, and hold at that level until August 15th. Flows would then be increased to 25,000 cfs until September 1st, at which time the operation as per the current Master Manual could be resumed. Cieslik Decl. ¶ 3. As Cieslik concludes:

> If the Corps cut back releases from Gavins point to 21,000 cfs by midnight by July 15th and held releases at 25,000 cfs until September 1st, it is unlikely that we would be able to maintain minimum service navigation flows in accordance with the Nebraska court order from July 17th through September 1st of this year.

Cieslik Decl. ¶ 4.

Thus, the Corps is now forced, as of midnight July 15th, 2003, to decide whether it will comply with the District of Nebraska's injunction by maintaining or increasing flows to preserve minimum navigation service, or whether it will implement the "low summer flows" required by the injunction order in this case. And whatever the Corps decides, it will be exposed to potential contempt proceedings. Counsel for both American Rivers in this case, and for the State of Nebraska in the District Court of Nebraska case, have advised counsel for the Corps that they intend to file

contempt motions against the Corps if the respective injunctions are not complied with. Thus, absent a stay, the district court's order places the Corps in the untenable position of choosing one potential contempt proceeding or the other.

The contradictory orders to which the Corps is now subject are the direct result of the district court's earlier denial of the Federal Defendants' motion to transfer this action to the District of Nebraska. That motion advised the district court here that there was a "real risk" that the Corps "could be subject to conflicting orders from both this Court and the District of Nebraska." See Federal Defs' Mem. in Support of Motion to Transfer Venue, at 9-12. The district court denied that motion, in part on the ground that "there may simply be no way to avoid conflicting decisions amongst the federal district and circuit courts with regards to the Corps' management of the Missouri River." American Rivers v. United States Army Corps of Engineers, No. 03-00241-GK, at 12 (D.D.C. May 21, 2003).

The district court dismisses the threat to the Corps of having to comply with inconsistent injunctions as being a problem of the Corps own making. Opin. at 64-44. By this, the district court means that the Corps should have clarified in its appeal of the Nebraska injunction that order did not prohibit noncompliance with the Master Manual when necessary to comply with the ESA. This argument fails for two reasons. First, the potential for conflict could have been avoided the conflict only if the Nebraska district court or the Eighth Circuit agreed with the district court in this case. but there is guarantee this would have occurred, and the district court would still remain free to issue its own ruling because the decision of neither the Nebraska district court nor the Eighth Circuit is binding on the district court here. Second, the district court cases brought in South Dakota v. Ubbelohde all concerned the scope of the 1944 Flood Control Act, not the ESA. There was no

apparent need to inject issues regarding compliance with other statutes such as the ESA. Accordingly, the district court's assertion that the Corps is now subject to two conflicting injunction orders in two different courts because of actions of its "own making" is simply without foundation.

### III.   A STAY WILL NOT IRREPARABLY HARM PLAINTIFFS.

Plaintiffs cannot show that they will suffer irreparable harm should this Court grant a stay. The appropriate standard of irreparable harm in this case is not the "take" of individual animals, even if those animals are endangered or threatened, but rather "jeopardy" to the entire species. See Water Keeper Alliance v. United States Dep't of Defense, 271 F.3d 21, 34 (1st Cir. 2001) (finding district court did not abuse its discretion in holding that death of single member of endangered species did not justify injunctive relief). Significantly, the district court does **not** claim that if the planned flows are allowed for this summer, any of the three species at issue will be in jeopardy. Opin. at 57-58.

The ESA allows the "take" of even endangered and threatened species under certain circumstances as long as that take does not rise to the level of threatening the extinction of the species as a whole. ESA §§ 7(o), 10. Here, the Service has issued an "incidental take statement" to the Corps that will allow the Corps to take a specified number of terns and plovers through its Missouri River operations during the summer of 2003. 2003 BiOp at 13-16. That "incidental take statement" will exempt the Corps from the ESA's prohibition against take, provided that the Corps abides by its terms and conditions. See ESA § 7(o)(2). Because this incidental take is allowed under the ESA, it cannot – by itself and without a greater showing of harm to the species – demonstrate irreparable harm.

Finally, because Plaintiffs have requested interim injunction relief, the irreparable harm that they must demonstrate must be a harm that will occur before this case can be resolved on the merits

-18-

— that is, while the preliminary injunction would be in place. In the context of this case, that means it is only appropriate for the Court to consider the effects of the Corps' proposed Missouri River operation for the summer of 2003. Any effects of any future Corps operations can be addressed during the merits of this case and cannot be used to demonstrate the irreparable harm necessary to justify a preliminary injunction.

Accordingly, plaintiffs have failed to show that they will incur irreparable harm if a stay of the district court's order is granted.

## IV. THE PUBLIC INTEREST WARRANTS A STAY

Granting the requested preliminary injunction will not further the public interest. This is a drought year, and the Corps' planned operations for this summer carefully balance the congressionally-authorized purposes of the Main Stem System under these difficult conditions. The Corps' operations also comply with the injunction issued by the Nebraska district court. As discussed above, the Service has concluded that those operations are an appropriate substitute for the RPA described in the 2000 Biological Opinion. As such, these operations are not likely to jeopardize the continued existence of the tern, the plover, or the pallid sturgeon. If the Court enjoins the Corps to implement low summer flows, it will undo this balance and will promote Plaintiffs' interests over the public interest.

The district court concluded that its injunction will serve the public interest not only by protecting endangered species, but also because by producing economic benefits. Opin. at 64. This conclusion grossly oversimplifies an extremely complex issue. The Corps' Missouri River operations affect a wide array of different economic interests on the river in different ways and assessing the exact effects of changes in those operations presents difficult technical questions.

Moreover, nothing in the Flood Control Act of 1944 requires the Corps to operate the Main Stem System simply for the maximum economic benefit of Missouri River users. Ubbelohde, 330 F.3d at 1030. Instead, the FCA and the Master Manual require the Corps to avoid flooding and maintain downstream navigation, and to consider the other congressionally-authorized purposes of the system, including irrigation, recreation, and fish and wildlife. Denying a stay of the district court's order will not result in an economic windfall for the users of the Missouri River. Rather, it will undo the Corps' efforts to manage the Main Stem System for all of the congressionally-approved uses set out in the FCA and expose the Corps to conflicting injunctions.

CONCLUSION

For the foregoing reasons, this Court should stay the district court's July 12, 2003, preliminary injunction order pending appeal.

Respectfully Submitted,

FRED DISHEROON
JAMES MAYSONETT
JOHN T. STAHR
ROBERT OAKLEY
Attorneys, U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 23795, L'Enfant Plaza Station
Washington D.C. 20026
(202) 514-2855

-20-

# EXHIBIT 5

SUMMONS ISSUED
THIS DATE

FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

02 MAY 13   AM 8:17

U. ... D. McFARLAND
CLERK

#811392

UNITED STATES DISTRICT COURT

DISTRICT OF NEBRASKA

CIV. 8:02CV217

STATE OF NEBRAS. A ex rel. DON
STENBERG, ATTOR JEY GENERAL FOR
THE STATE OF NEBRASKA,

   Pla: itiff,

  v.

LT. COLONEL KURT F. UBBELOHDE,
DISTRICT ENGINEER, OMAHA DISTRICT,
UNITED STATES ARMY CORPS OF
ENGINEERS, and GE NERAL DAVID
FASTABEND, COM' TANDER, NW
DIVISION, PORTLA JD, OREGON,

   De endants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

COMPLAINT

**JUDGE SMITH CAMP**

**MAGISTRATE JUDGE
JAUDZEMIS**

1. This is a civil action for declaratory and injunctive relief to prevent the U.S.

Army Corps of Engineers ("Corps") from operating the main stem reservoirs of the Missouri

River which are locate i in the states of Nebraska, South Dakota, North Dakota, and Montana

contrary to federal law.

2. This a.tion arises under the Flood Control Act of 1944, 33 U.S.C. § 701 et seq.

("Act"); the Declaratc y Judgments Act, 28 U.S.C. § 2201; the Administrative Procedures Act,

5 U.S.C. § 701 et seq. the National Environmental Policy Act, 42 U.S.C. § 4321 et seq.

("NEPA"); the Endan; cred Species Act, 16 U.S.C. § 1531 et seq. ("ESA"); and the Corps' 1979

Master Manual.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

**ATTACHMENTS IN
SEPARATE FOLDER**

3. Venue s proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (e) and 5 U.S.C. § 703.

4. Plainti: f State of Nebraska ("Nebraska") is a sovereign state and brings this action on its own beha f and as *parens patriae* for its residents.

5. Defend ant Lieutenant Colonel Kurt F. Ubbelohde is the District Engineer of the Corps in charge of the operation of the main stem reservoirs located on the Missouri River.

6. Defend ant Brigadier General David Fastabend is Commander, Northwest Division, Portland, Or gon, stands in superior authority to Lieutenant Colonel Ubbelohde, and is also responsible for th operation of the main stem reservoirs on the Missouri River.

7. The C rps operates six dams and reservoirs on the main stem of the Missouri River. Those dams and reservoirs are Fort Peck in Montana, Garrison Dam and Lake Sakakawea in North Dakota, Oahe in North Dakota and South Dakota, Big Bend Dam and Lake Sharpe in South Dakota, Fort Ra idall Dam and Lake Francis Case in South Dakota, and Gavins Point Dam and Lewis and Clark Lake in Nebraska and South Dakota.

8. Pursua it to the authorities arising under the Act, the Corps adopted and published a Master Manual in 1979 for the purpose of operating the main stem Missouri River reservoirs and equitably distribu ng the benefits associated with those reservoirs among the Missouri River basin states. No state ppealed the Corps' adoption of the 1979 Master Manual or any of its provisions. Each year the Corps adopts a Missouri River Mainstem System Annual Operating Plan ("AOP") that is consistent with the Master Manual for the purpose of providing more precise reservoir oper ing instructions. The Corps adopted an AOP for the present year.

9. Althou gh the Master Manual serves as the basis upon which the Corps must operate the main stem reservoirs of the Missouri River, it is subject to NEPA and ESA.

10.     On or  bout April 25, 2002, the State of South Dakota, by and through its

Governor William J. } nklow, filed a complaint in the United States District Court of South

Dakota, Central Divisi n, seeking an order from the Court restraining the Corps and the

Defendants from alteri 1g the level of Lake Oahe in North and South Dakota to protect South

Dakota's interests in r creational fishing. On or about April 30, 2002, South Dakota amended its

Complaint to prevent ' 1e Defendants from altering the levels of any of the main stem reservoirs

lying upstream of Neb aska. A copy of the State of South Dakota's First Amended Complaint is

attached hereto as Exh bit A.

11.     On M: ʒ 8, 2002, Nebraska filed its Motion to Intervene and Motion to Dismiss

with the District Court of South Dakota, Central Division.

12.     On M: y 10, 2002, the District Court of South Dakota issued an Order denying.

Nebraska's Motion tc ntervene and Motion to Dismiss.

13.     On Ap il 30, 2002. the Declaration of Lawrence I. Cieslik was filed with the

District Court of Sout . Dakota, Central District. Mr. Cieslik is the Chief of the Missouri River

Basin Water Managen ent for the Corps, NW Division, in Omaha, Nebraska. In his Declaration,

Mr. Cieslik indicates t at if the level of Lake Oahe is maintained and the Corps is prohibited

from lowering the lev. ls of other main stem reservoirs, main stem system releases will be 13,000

cubic feet per second ' :fs) which is less than the level necessary to meet navigation service flow

targets below Gavins  oint, as identified in the 1979 Master Manual and AOP. A true and

accurate copy of Mr. ( ieslik Affidavit is attached hereto and fully incorporated as Exhibit B.

14.     On M: y 8, 2002, Mr. Cieslik offered a Supplemental Declaration. A true and

accurate copy of Mr. ( ieslik's Supplemental Declaration is attached hereto and fully

incorporated as Exhib t C.

3

15.     On May 10, 2002, the District Court issued an Order from the bench prohibiting the Corps from lowering the lake levels of Lake Oahe and Lake Francis Case until after May 25, 2002.

16.     Roger C. Patterson, Director of the Nebraska Department of Natural Resources, is Nebraska's official charged with administering Nebraska's water laws. Director Patterson has requested assurances from the Corps that the main stem Missouri River reservoirs shall be managed to protect the lake level of Lewis and Clark Reservoir and maintain the flows at least to the minimum navigational level as specified in the 1979 Master Manual. To date, the Corps has provided no such assurances to Director Patterson nor Nebraska. A true and accurate copy of Director Patterson's letter to the Corps is attached hereto as Exhibit D.

17.     Any change in the operation of the main stem Missouri River reservoirs that is contrary to the 1979 Master Manual, AOP, the Act, the NEPA, the ESA and other applicable federal law that will reduce the level of Lewis and Clark Lake, or cause the flows during the summer months to be less than the minimum navigational target levels identified in the 1979 Master Manual, will likely result in the shutdown or reduced operation of four power plants in Nebraska and impair municipal water quality. Reducing the flows below the minimum navigational target levels will immediately impair Nebraska's fisheries; damage Nebraska's tourism industry; and harm Nebraska's marinas and barge industry.

18.     The United States Fish and Wildlife Service ("Service"), pursuant to its authority under the ESA, determined that the northern great plains population of the piping plover is "threatened". 50 Fed. Reg. 50,726 (December 11, 1985). The Service proposed critical habitat for this population of piping plover, which included approximately 87 miles of flowing Missouri River bordering Nebraska and approximately 33 miles of Nebraska lands on Lewis and Clark

4

Lake. 66 Fed. Reg. 31,760, 31,771 (June 12, 2001). On May 8, 2002, the Declaration of Casey D. Kruse, Senior Wildlife Biologist for the Corps in Omaha, Nebraska, was filed with the District Court in South Dakota. Mr. Kruse's declaration indicates that the piping plover may begin nesting on sandbars in and around the Missouri River and Lewis and Clark Lake before May 22, 2002. A true and accurate declaration of Mr. Kruse's declaration is attached hereto and incorporated as Exhibit E.

19.     The Service, pursuant to its authority under the ESA, determined that the interior least tern is "endangered". Like the piping plover, the least tern may begin nesting on sandbars exposed by reduced water levels along the shoreline of Lewis and Clark Lake and along the Missouri River in Nebraska in early June.

20.     After May 25, 2002, the Corps may well be prevented by the ESA from restoring water levels in Lewis and Clark Lake and from resuming normal releases into the Missouri River below Gavins Point Dam because doing so may result in a "take" of the piping plover and/or the interior least tern by inundating their nests.

21.     On May 8, 2002, the Declaration of Douglas C. Latka was filed with the District Court in South Dakota. Mr. Latka's declaration indicates the fishery in Nebraska will be harmed unless flows are maintained above 13,000 cfs. A true and accurate copy of Mr. Latka's declaration is attached hereto and fully incorporated as Exhibit F.

22.     If flows are not immediately increased to the minimum navigational levels required by the 1979 Master Manual and current AOP, Nebraska may be faced with excessively low water levels in Lewis and Clark Lake and excessively diminished Missouri River flows well into the summer months of June and July. These sustained low water levels and diminished flows are likely to result in the shutdown or reduced operation of four power plants. The low

5

flows may also cause barges to be stranded on the river. If the barges are stranded on an uneven surface, they may crack open leaking their contents into the river. The discharge of these contents into the river would require municipalities to take costly conservation measures or modify their systems. Flows below 13,000 cfs will also impair Nebraska's fisheries, damage Nebraska's tourism industry, harm Nebraska's marinas, barge industry and persons who transport commodities via barge.

23.     The State of North Dakota has indicated it will file litigation in North Dakota preventing the Corps from lowering of the lake level of Lake Sakakawea. If the Corps is prevented from drawing water from Lake Sakakawea for use below Lake Francis Case, the lake level of Lewis and Clark Lake will be reduced further and the river flow below Gavins Point will be further reduced. This action would cause still greater harm to Nebraska and its residents. A copy of an article that appeared in the Sioux Falls Argus Leader online edition, May 11, 2002 is attached hereto and fully incorporated herein as Exhibit G.

## CLAIM FOR RELIEF

24.     Plaintiff incorporate by reference and reallege the paragraphs above.

25.     The Corps is legally obligated to operate the main stem reservoirs in accordance with the 1979 Master Manual, the Act, the NEPA, and the ESA.

26.     The Corps is legally obligated to operate the main stem reservoirs in a manner that does not harm the interests of the State of Nebraska in its capacity as a sovereign state and *parens patriae* for its residents. Plaintiff and its residents will suffer long-term irreparable harm if the defendants refuse or fail to provide water to Lewis and Clark Lake and the Missouri River downstream of Gavins Point Dam contrary to the requirements of the 1979 Master Manual and current AOP. Operating contrary to the 1979 Master Manual and current AOP is a violation of

6

the Administrative Procedures Act, 5 U.S.C. § 706; the Act, and NEPA.

27.    Plaintiff is entitled to a declaratory judgment confirming that:

(a)    Defendants must operate main stem reservoirs in accordance with the 1979 Master Manual and current AOP, the Act, the NEPA, the ESA, and other applicable law.

(b)    Defendants must operate the main stem reservoirs so as to maintain the lake level of Lewis and Clark Lake at its present level after May 15, 2002 and maintain flows at the minimum navigational flows below Gavins Point Dam as identified in the 1979 Master Manual and current AOP.

(c)    Such other relief as the Court may deem fair and equitable.

Respectfully submitted this 13th day of May, 2002.

DON STENBERG
Attorney General of Nebraska

*Request trial in Omaha.*

David D. Cookson
Counsel of Record
Assistant Attorney General
2115 State Capitol
Lincoln, Nebraska 68509
(402) 471-2682

7

# EXHIBIT 6

UNITED STATES DISTRICT COURT

DISTRICT OF NEBRASKA

CASE NO.
~~CIV.~~/ ___ 8:02 CV 217

| | | |
|---|---|---|
| STATE OF NEBRASKA ex rel. DON STENBERG, ATTORNEY GENERAL FOR THE STATE OF NEBRASKA, | ) ) ) ) | |
| Plaintiff, | ) ) | APPLICATION FOR |
| v. | ) ) | A TEMPORARY |
| LT. COLONEL KURT F. UBBELOHDE, DISTRICT ENGINEER, OMAHA DISTRICT, UNITED STATES ARMY CORPS OF ENGINEERS, and GENERAL DAVID FASTABEND, COMMANDER, NW DIVISION, PORTLAND, OREGON, | ) ) ) ) ) ) | RESTRAINING ORDER |
| Defendants. | ) | |

Comes now, the State of Nebraska *ex rel.* Attorney General Don Stenberg, and moves

this Court for a Temporary Restraining Order pursuant to FED. R. CIV. P. 65(b). In support of

this Application, Plaintiff states as follows:

    1.    Plaintiff has this day filed with this Court a Complaint, a copy of which is

attached hereto and incorporated herein by reference, seeking declaratory and injunctive relief to

compel the United States Army Corps of Engineers ("Corps") to operate the main stem

reservoirs on the Missouri River in accordance with the 1979 Master Manual, the Flood Control

Act of 1944, 33 U.S.C. § 701 et seq. ("Act"); the National Environmental Policy Act, 42 U.S.C.

§ 4321 et seq. ("NEPA"); the Endangered Species Act, 16 U.S.C. § 1531 et seq. ("ESA"); and

compel the Corps to operate the main stem reservoirs so as to maintain the lake level of Lewis and Clark Lake at its present level and maintain flows at the minimum navigational flows identified in the 1979 Master Manual and the current Annual Operating Plan ("AOP").

2.      Nebraska will suffer irreparable and serious long-term harm and injury unless it receives the requested relief.

3.      Below Gavins Point Dam in Nebraska there are four power plants located along the banks of the Missouri River. Each of these four power plants draws water from the Missouri River for cooling purposes and returns that water to the Missouri River, at temperatures generally ranging from 18 to 24 degrees Farenheit warmer than when withdrawn. Each of these four power plant operates in accordance with thermal discharge permits issued by appropriate state and federal agencies. To remain in compliance with the thermal discharge permits, the flows of the Missouri River typically need to equal or exceed the minimum navigational levels specified in the 1979 Master Manual and AOP during the months of June, July and August.

4.      Nebraska maintains a fishery in the Missouri River in Lewis and Clark Lake and below Gavins Point Dam. Various fish species spawn during the spring and summer months and require flows at or above the flows specified in the 1979 Master Manual and AOP for optimum reproduction. Flows less than those specified in the 1979 Master Manual and AOP may cause a reduced reproduction rate among those species, which will harm Nebraska's recreational fishing industry and tourism industries.

5.      Numerous municipalities located below Gavins Point Dam in Nebraska draw a portion of their municipal and industrial water supplies from the Missouri River. Flows less than those specified by the 1979 Master Manual and AOP tend to be degraded in quality. To provide water of acceptable quality to their residents, municipalities drawing water from the Missouri

River may need to engage in costly measures to treat the water to improve its quality if flow conditions are not equal to or greater than the minimum navigational target flows specified in the 1979 Master Manual and AOP during the summer months. Water quality can be further diminished if toxins are discharged into the Missouri River from barges that have been left stranded due to low flow conditions.

6.     A number of barge operators provide commodities to markets in Nebraska and to points farther downstream. These barge operators require flows at or above the minimum navigational levels provided for in the 1979 Master Manual and AOP to operate. Should flows in the Missouri River drop below those specified in the 1979 Master Manual and AOP, these barge operators will be forced to immediately discontinue their economic activities. Certain barges may become stranded as a result of the low flow conditions. If those barges are stranded on an uneven surface, they may crack open and discharge their contents into the river causing water quality problems for public water suppliers. Furthermore, transportation rates for moving these commodities will increase, causing harm to those persons who ship or receive those commodities.

7.     In Lewis and Clark Lake and below Gavins Point Dam, there are numerous commercial marinas and individual boat owners who rely upon the level of Lewis and Clark Lake and flows of the Missouri River to be maintained at the levels specified in the 1979 Master Manual and AOP. Any reduction in the levels of Lewis and Clark Lake or diminishing flow in the Missouri River below the amounts specified in the 1979 Master Manual and AOP will immediately cause commercial marinas to cease operation, creating extreme economic hardship. Furthermore, the recreational boating and fishing enjoyed by thousands of Nebraskans will be destroyed unless the Corps operates the main stem reservoirs in accordance with the 1979 Master

3

Manual and AOP.

8. Resultant injury and damages to the State of Nebraska if the Corps fails to operate in accordance with the 1979 Master Manual and AOP will exceed many millions of dollars.

9. The piping plover and interior least tern are federally listed respectively as threatened and endangered species. Both species are known to nest on exposed gravel bars created by low flow conditions along the Missouri River. The piping plover typically begins nesting prior to May 25 and the interior least tern by early June.

10. Once the threatened or endangered species have established their nests on the gravel bars created by the low flow conditions, the Corps will be unable to raise the water levels in Lewis and Clark Lake or on the Missouri River below Gavins Point Dam without inundating those nests and causing a "take" of the species, in violation of the Endangered Species Act.

11. Unless immediate relief is granted, Nebraska may be forced to accept excessively low flow conditions on the Missouri River and excessively low lake levels at Lewis and Clark Lake.

12. It is not in the public interest for the Corps to operate contrary to the requirements of the 1979 Master Manual and AOP, the Flood Control Act of 1944, NEPA, or ESA.

13. Granting the relief sought, this Court will preserve the historic administration of the Missouri River by the Corps in accordance with the 1979 Master Manual and AOP.

14. This application for a Temporary Restraining Order is supported by the Brief In Support of the Application, the Complaint, the Exhibits attached to the Complaint, and papers filed in this action with the Court, all of which are hereby incorporated by reference into this

4

application.

15.    On May 10, 2002, pursuant to FED. R. CIV. P. 65(b), the undersigned advised counsel for the Corps and the U.S. Attorney assigned to the South Dakota case of Nebraska's intention to file this Application, Complaint and the basis for so doing. Also on May 10, 2002, Special Assistant Attorney General, Donald Blankenau advised members of the United States Attorney's Office, Omaha, Nebraska, of Nebraska's intention to file this Application, Complaint and the basis for so doing.

Wherefore Plaintiff respectfully requests that this Court forthwith issue an Order:

a.     Compelling the Defendants to operate the main stem reservoirs in accordance with the 1979 Master Manual and AOP, the Act, NEPA, ESA, and other applicable federal law.

b.     Commanding the Corps to operate the main stem reservoirs so as to maintain the lake level of Lewis and Clark Lake at its present level after May 15, 2002 and maintain flows at the minimum navigational flows below Gavins Point Dam as identified in the 1979 Master Manual and current AOP.

c.     Such other relief as the Court may deem fair and equitable.

Respectfully submitted this 13th day of May, 2002.

                              DON STENBERG
                              Attorney General of Nebraska


                              David D. Cookson
                              Counsel of Record
                              Assistant Attorney General
                              2115 State Capitol
                              Lincoln, NE 68509
                              (402) 471-2682

5

1261

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEBRASKA

|  |  |
|---|---|
| STATE OF NEBRASKA ex rel. DON STENBERG, ATTORNEY GENERAL FOR THE STATE OF NEBRASKA, | CIV./__8:02 CV 217 |
| Plaintiff, | CERTIFICATE OF SERVICE |
| v. | |
| LT. COLONEL KURT F. UBBELOHDE, DISTRICT ENGINEER, OMAHA DISTRICT, UNITED STATES ARMY CORPS OF ENGINEERS, and GENERAL DAVID FASTABEND, COMMANDER, NW DIVISION, PORTLAND, OREGON, | |
| Defendants. | |

The undersigned hereby certifies that true and correct copies of Nebraska's APPLICATION FOR A TEMPORARY RESTRAINING ORDER and attachments were served upon each of the following by facsimile and by enclosing the same in envelopes with first class postage prepaid and affixed thereto, and depositing said envelopes in the United States mail, at Lincoln, Nebraska on this 13th day of May, 2002:

Fred R. Disheroon
Department of Justice
Environment & Natural Resource Division
601 D. St., NW
Washington, DC  20004
FAX 202-616-9667

Gary Henningsen
USACE
Omaha District Counsel
215 N. 17th
Omaha, NE  68102
FAX 402-697-2504

Martin R. Cohen
USACE, HQ
Office of Chief Counsel
441 G St., NW
Washington, DC  20314
FAX 202-761-4932

Cheryl Schrempp Dupris
U.S. Attorney's Office
Pierre Office
225 S. Pierre St., Suite 337
Pierre, SD  57501-2489
FAX 605-224-8305

John Seeronen
USACE, NW Division
220 NW 8th St.
Portland, OR  97029-3589
FAX 503-808-3766

DATED this 13th day of May, 2002

DON STENBERG
Attorney General of Nebraska

David D. Cookson
Counsel of Record
Assistant Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682

2